# Judge v. Academia, Inc.

United States District Court for the Northern District of California

May 7, 2026, Decided; May 7, 2026, Filed

Case No. 25-cv-05857-AMO

**Reporter**
2026 U.S. Dist. LEXIS 101825 *; 2026 LX 208393; 2026 WL 1256876

RAJBIR SINGH JUDGE, Plaintiff, v. ACADEMIA, INC., Defendant.

**Counsel:** **[*1]** For Rajbir Singh Judge, on behalf of himself and all others similarly situated, Plaintiff: Nicole Cabanez, PRO HAC VICE, Yaman Salahi, Salahi PC, San Francisco, CA; Taylor Applegate, San Francisco, CA.

For Academia, Inc., an Oregon corporation, doing business as, Academia Networks, Inc., Defendant: Eric J. Ball, LEAD ATTORNEY, Kimberly Irene Culp, Fenwick & West LLP, Mountain View, CA; Dakota Skyler Speas, John Wall Baumann, Quinn Emanuel Urquhart and Sullivan, LLP, Los Angeles, CA; Shon Morgan, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA.

**Judges:** ARACELI MARTÍNEZ-OLGUÍN, United States District Judge.

**Opinion by:** ARACELI MARTÍNEZ-OLGUÍN

## Opinion

**ORDER DENYING MOTION TO COMPEL ARBITRATION OR TO DISMISS AND STRIKE; AND GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER**

Re: Dkt. Nos. 26, 41, 54

Plaintiff Rajbir Singh Judge brings this case against Defendant Academia, Inc. for allegedly misappropriating his name in advertisements for Academia's Mentions service. In this putative class action, Judge asserts on his own behalf a California statutory right of publicity claim, *Cal. Civ. Code § 3344*. He also aims to represent residents of California and seven other states whose names appeared in Academia's advertisements. **[*2]** Academia now moves to compel arbitration, or alternatively to dismiss or strike Judge's operative complaint. At the same time, Judge moves for a protective order under *Federal Rule of Civil Procedure 23(d)* to remedy Academia's purportedly misleading communications with the putative class. The parties presented oral argument regarding both motions on February 5, 2026.[1]

For the reasons explained below, the Court **DENIES** Academia's motion to compel arbitration, dismiss, and strike; and **GRANTS IN PART** and **DENIES IN PART** Judge's motion for a protective order.

**I. BACKGROUND**

[1] Because Judge's proposed surreply is unnecessary to resolve Academia's motion, his motion for leave to file a surreply is **DENIED**. *See* Dkt. No. 54.

This section comprises the well-pleaded allegations from the operative First Amended Complaint, which are taken as true and viewed in the light most favorable to Judge for the purpose of the motion to dismiss. *See* *Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008)*.

Rajbir Singh Judge is a "scholar of South Asia, Postcolonial Theory, and Modern World History." Dkt. No. 18 ("FAC") ¶ 5. Academia is a website "for sharing academic research and which allows researchers and academics to create profiles featuring their work." *Id.* ¶ 1. Judge is an Academia user. Dkt. No. 51 ¶ 4.

Academia has a Mentions service that "track[s] a person's mentions and citations" for a monthly fee of $29, or $159 yearly. FAC ¶ 14. **[*3]** Academia prolifically solicits subscriptions to this service. *Id.* ¶ 16. Its solicitations feature the names of third parties, though those third parties never provided consent to use their names. *Id.* ¶¶ 16-24. For instance, as soon as a user creates an account, Academia will send emails promoting the Mentions service. *Id.* ¶ 17. The email will typically be addressed to a user by name and indicate that "[user's name] was mentioned by [other person's name]." *Id.* ¶¶ 17-18. It will then prompt the user to "View your Mention." *Id.* ¶ 17. An example of such an email, with names redacted, is below:

If a user clicks the "View your Mention" link, they are directed to a solicitation on Academia's website. *Id.* ¶ 19. The solicitation begins with "Academia Premium." *Id.* It then indicates that a specific number of papers mention the user's name, such as "146 papers mention [user's name]." *Id.* The next line references the other person's name, such as "Including one written by Rajbir Singh Judge." *Id.* After listing various features of the Mentions service, the solicitation directs the user to "Try Premium for $1 and view your Mentions." *Id.* An example of the website solicitation is below:

Finally, Academia **[*4]** uses the browsing behavior of non-paying users to induce those users to pay for its Mentions service. *Id.* ¶ 21. For instance, if a user were to view Judge's profile or one of his papers on Academia, that user would begin receiving on-site Mentions advertisements that contain his name. *Id.* ¶ 22. The advertisement would ask the user to "Find papers that mention [user's name]," with the next line beginning with "Including one in Rajbir Singh Judge's research area." *Id.* As with Academia's other solicitations, it would end by asking the user to "Try Premium for $1 and view your Mentions." *Id.* An example of such an on-site ad is below:

**II. MOTION TO COMPEL ARBITRATION**

To determine if an arbitration agreement exists, "federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855 (9th Cir. 2022)* (citation omitted). Under California law, a contract is only formed if the parties "manifest their mutual assent to the terms of the agreement." *Id.* A party's receipt of a paper contract generally puts them on inquiry notice of its terms, which is sufficient to show their assent to the contract. *Sellers v. JustAnswer LLC, 73 Cal. App. 5th 444, 461, 289 Cal. Rptr. 3d 1 (2021)*. "These elemental principles of contract formation apply with equal force to contracts formed online. Thus, if a website **[*5]** offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Berman, 30 F.4th at 855-56*.

Internet contracts are generally classified by "the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Sellers, 73 Cal. App. 5th at 463*. Courts are most likely to find scrollwraps and clickwraps enforceable, since they require the user to affirmatively indicate their assent to the agreement. *Id. at 463-66*. But it is the "degree of notice provided, not the label, that is determinative." *B.D. v. Blizzard Ent., Inc., 76 Cal. App. 5th 931, 950, 292 Cal. Rptr. 3d 47 (2022)*. "[A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous

notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman, 30 F.4th at 856*.

Academia argues that there are two specific instances and a third general circumstance in which Judge unambiguously manifested his consent to Academia's Terms of Use and thereby agreed to arbitration. First, in 2015, when Judge used Academia's "Find **[*6]** Your Friends" feature to import his contacts from Google. Second, in 2022, when Judge created a second Academia account. Finally, Academia points to Judge's "long-standing and enthusiastic use" of Academia. Dkt. No. 52 at 11.[2] The Court examines each in turn and concludes none demonstrate Judge's unambiguous manifestation of assent to Academia's arbitration agreement.[3]

**A. The 2015 Find Your Friends Google Sign-In Screen**

In 2015, Judge used Academia's "Find Your Friends" feature to import contacts from Google. Dkt. No. 42 ¶¶ 18-21; Dkt. No. 53 ¶¶ 7-8; Dkt. No. 53-1. According to Academia, Judge viewed the "Find Your Friends" page and then clicked on a "Find Google Contacts" button. Dkt. No. 42 ¶¶ 18-19; Dkt. No. 42-11. Next, a screen from Google appeared. Dkt. No. 42 ¶ 20. The screen began with "academia.edu would like to:" and listed four account permissions, including "View your basic profile info" and "View your contacts." *Id.*; Dkt. No. 42-12. It then advised Judge that: "By clicking Accept, you allow this app and Google to use your information in accordance with their respective terms of service and privacy policies. You can change this and other Account Permissions **[*7]** at any time." *Id.* Right below that text, there was a blue "Accept" or "Allow" button, which Judge clicked. *Id.*; Dkt. No. 42 ¶ 21. The screen was substantially similar to the below. Dkt. No. 42-12.

If a website in a clickwrap or sign-in wrap seeks to incorporate by reference terms included in a separate page, courts analyze whether it is "readily apparent" that a hyperlink to that page exists. *See, e.g., Berman, 30 F.4th at 857* ("Consumers cannot be required to . . . aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'" (citation omitted)); *Sellers, 73 Cal. App. 5th at 481*. Here, it is not clear that "you allow this app and Google to use your information in accordance with their respective terms of service" provided reasonably conspicuous notice of Academia's Terms of Use. At oral argument, Academia conceded that this advisal contained no hyperlink to its Terms. Academia nevertheless contends that because it had a link to the Terms of Use on its website and emails, and because Judge clicked on nearby links, the Terms link on those other pages was sufficient to put him on notice of its terms. These circumstances result in the advisal being more akin to a browsewrap, which courts have a "traditional reluctance to enforce." **[*8]** *See Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1178 (9th Cir. 2014)*. Moreover, Academia provided no evidence that Judge's clicking of the nearby links was "temporally coupled" with his use of the Find Your Friends feature. *See Godun v. JustAnswer LLC, 135 F.4th 699, 714 n.7 (9th Cir. 2025)*. Google's bare, un-hyperlinked reference to the "terms of service" of "this app," in combination with separate pages on another website containing links to the Terms of Use, were insufficient to provide Judge with reasonably conspicuous notice of those terms.

Additionally, the advisal limited its terms to "use [of] your information." The California Court of Appeal found that a user did not consent to arbitration through a similar advisal in *Herzog v. Superior Ct., 101 Cal. App. 5th 1280, 321 Cal. Rptr. 3d 93 (2024)*, *review denied* (Aug. 28, 2024). The app there required users to check a box indicating that they "understand and agree that your use of this . . . mobile application . . . is subject to the Terms of Use." *Herzog, 101 Cal. App. 5th at 1297*. The advisal then notified the user that checking the box indicated they understood "your

[2] All citations to page numbers in filings on the docket refer to ECF pagination.

[3] Judge raises various evidentiary objections, including insufficient authentication. Because Judge prevails even when Academia's evidence is considered, his objections are **OVERRULED AS MOOT**. Similarly, since Judge prevails even resolving factual disputes in favor of Academia, those disputes (such as whether he created a second account) need not be reached.

personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use" and that "personal information . . . will be stored and processed . . . in the United States, which may have different data protection laws **[*9]** than the country in which you reside." *Id.* (emphasis removed). The court first held that the advisal failed to give reasonably conspicuous notice of all terms because the advisal "convey[ed] a finite set of understandings related to the management of [users'] personal information" and "implicitly excluded the possibility that same action would have other consequences," such as agreeing to arbitration. *Id. at 1299*. Further, there was no unambiguous manifestation of assent to arbitration because the final parts of the advisal "created ambiguity" regarding whether a user only narrowly agreed to have their personal information used consistently with the Terms of Use or more broadly agreed to all its terms. *Id. at 1304*.

The advisal here similarly did not give reasonably conspicuous notice of an arbitration agreement nor demonstrate Judge's unambiguous manifestation of assent to arbitration. The advisal limited its scope to "use [of] your information," thereby conveying that any agreement would be related to management of a person's information. *See id. at 1299*. In fact, the advisal expressly told Judge he could "change this and other Account Permissions at any time," implying any agreement was limited to data use permissions, **[*10]** not other terms. If there was reasonably conspicuous notice of any agreement, it was limited to terms about use of personal information, not arbitration of disputes. *See id.* Moreover, since the advisal created ambiguity over whether Judge was agreeing narrowly to terms about use of personal information or more broadly to the entire Terms of Use, he did not unambiguously manifest consent to arbitration. *See id. at 1304*.

In sum, the 2015 Google sign-in screen did not provide Judge with reasonably conspicuous notice of the Terms of Use. Even if it did, Judge did not have reasonably conspicuous notice of or unambiguously manifest assent to arbitration.

**B. The 2022 Google Pop-Out**

Academia also contends that Judge consented to arbitration when he created a second account by logging in with Google in 2022 because he would have seen a pop-out titled "Sign in to academia.edu with google.com." *See* Dkt. No. 42 ¶ 22. The pop-out "advised plaintiff of Academia's Terms and contained a hyperlink to the then-current version of the Terms." *Id.* Judge then clicked the "Continue" button to create a new account. *Id.* The exact "text and format displayed to plaintiff may have varied slightly." *Id.* However, Academia's **[*11]** "best estimation" of the pop-out advises users (where underlines indicate blue hyperlinks): "To continue, google.com will share your name, email address, and profile picture with this site. See this site's privacy policy and terms of service." *Id.*; Dkt. No. 42-13. Academia's best estimation of the pop-out, Dkt. No. 42-13, is below:

Assuming without deciding that the advisal gave reasonably conspicuous notice of the Terms of Use, this pop-out did not "*explain* that certain actions will be understood by the offeror to signal assent to contractual terms," so Judge could not have unambiguously manifested assent. *See Godun, 135 F.4th at 711* (citing *Berman, 30 F.4th at 857*). An explanation sufficient to unambiguously manifest consent "generally looks like an explanatory clause, usually at the beginning of an advisal—for example: '*By clicking* the Continue >> button, you agree to the Terms & Conditions.'" *Id.* (citation omitted). Instead, the advisal merely stated that Google would share certain information with Academia and directed Judge to "[s]ee this site's privacy policy and terms of service." It did not include any clause explaining that a particular action would constitute agreement to the Terms of Use. *See id. at 712-13*. Nor did it direct Judge **[*12]** to agree to those terms. *Cf. id.* Rather, it directed him to "[s]ee" Academia's "terms of service." Because the pop-out contained no indication that a user would agree to the Terms of Use by clicking Continue, Judge did not unambiguously manifest his consent to those terms. *See id.; Harris v. Iheartmedia, Inc., No. 25-CV-06038-EKL, 2026 U.S. Dist. LEXIS 15564, 2026 WL 194576, at *4 (N.D. Cal. Jan. 6, 2026)* (concluding the same with a similar Google pop-out that "instructed the user to 'review' the terms of service"), *appeal docketed*, No. 26-590 (9th Cir. Jan. 29, 2026).

**C. Repeated Use of Academia**

Finally, Academia contends that Judge's repeated use of its website constituted acceptance to its Terms of Use. Specifically, Academia argues that Judge: (1) viewed its website (which contains a link to its Terms of Use) tens of thousands of times, 29 times scrolling to the footer with the Terms link and twice clicking buttons immediately next to that link; (2) twice viewed the website when it had banners announcing that the Terms had changed; (3) opened thousands of emails from Academia containing a link to the Terms, and three times clicked an adjacent link; and (4) viewed the login page in 2016, which contained a notice that "By clicking Sign Up, you agree to our Terms," and then subsequently created a new account **[*13]** in 2022. Dkt. No. 42 ¶¶ 22-27. None of these demonstrate an enforceable contract based on inquiry notice.

The first three do not show inquiry notice because "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *See* *Nguyen, 763 F.3d at 1178-79*. Judge did not take an affirmative act to demonstrate his assent to the terms in any of these circumstances. At oral argument, Academia relied on *Cairo, Inc. v. Crossmedia Servs., Inc.* for the proposition that continual use alone can constitute assent. *No. 04-CV-04825-JW, 2005 U.S. Dist. LEXIS 8450, 2005 WL 756610, at *5 (N.D. Cal. Apr. 1, 2005)*. But in that 20-year-old case, almost every webpage contained the notice: "By continuing past this page and/or using this site, you agree to abide by the *Terms of Use* for this site." *2005 U.S. Dist. LEXIS 8450, [WL] at *2, *5*. None of Academia's webpages contained such language. Instead, that language comes from the Terms of Use itself, e.g., Dkt. No. 42-7 at 2, and Academia has not submitted evidence that Judge had actual knowledge of that term. Thus, *Cairo* ***[*14]*** is inapposite.

As to the final circumstance, though Judge viewed the Academia login page in 2016 and that page advised that clicking "Sign Up" constituted agreement to the Terms, the six-year gap between Judge viewing the login page and creating a new account precludes finding he had inquiry notice that he would assent to the terms by creating that account. *See* *Godun, 135 F.4th at 714 n.7* (holding notice must be "temporally coupled with the relevant transaction").

**D. Conclusion**

For the reasons stated above, the Court **DENIES** Academia's motion to compel arbitration and now turns to its motion to dismiss.

**III. MOTION TO DISMISS**

A motion to dismiss for lack of Article III standing is evaluated under *Federal Rule of Civil Procedure 12(b)(1)*. *Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011)*. *Rule 12(b)(1)* motions may be either facial, where the inquiry is confined to the allegations in the complaint, or factual, where the court looks beyond the complaint to extrinsic evidence. *Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014)*. When a defendant challenges jurisdiction facially, all material allegations in the complaint are assumed true, and the court determines whether the factual allegations are sufficient to invoke the court's subject matter jurisdiction. *Id.*

To survive a motion to dismiss for failure to state a claim under *Rule 12(b)(6)*, a complaint must plead "enough facts to state a claim **[*15]** to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. A court must assume that the plaintiff's allegations are true and draw all reasonable inferences in their favor. *Manzarek, 519 F.3d at 1031*. However, it need not construe

conclusory statements or unreasonable inferences as true. In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

**A. Standing**

To have standing to sue in federal court, a plaintiff must suffer a concrete injury. TransUnion LLC v. Ramirez, 594 U.S. 413, 423, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021). That requires "a close historical or common-law analogue for their asserted injury." Id. at 424. The prototypical concrete harms are "physical or monetary." Id. at 425. But some intangible harms, such as those protected by common-law privacy torts, are also sufficiently concrete. *Id.* While a legislature's view to create a new cause of action is "instructive" and must be afforded "due respect," it cannot "simply enact an injury into existence." Id. at 425-26. Thus, the standing inquiry is "particularized to a plaintiff's circumstances and benchmarked to a specific tort." Popa v. Microsoft Corp., 153 F.4th 784, 791 (9th Cir. 2025). Courts disagree—and the Ninth Circuit has not decided—whether this requires a plaintiff to "satisf[y] each element required to state **[*16]** a common-law cause of action" or merely suffer a harm "similar in kind" to the harm protected by common law. Id. at 790 (citations omitted). That debate need not be settled here, since a California statutory right of publicity claim necessarily satisfies the elements for a common-law appropriation of name or likeness claim. *See* Gehringer v. Ancestry.com Operations Inc., No. 25-CV-05974-AMO, 2026 U.S. Dist. LEXIS 54516, 2026 WL 734526, at *3-4 (N.D. Cal. Mar. 16, 2026).

The Restatement includes four privacy torts, including the tort of "appropriation of the other's name or likeness." *Restatement (Second) of Torts § 652A (A.L.I. 1977)*. The Restatement defines the tort as: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Id. § 652C*. Thus, a common-law claim required showing (1) appropriation of another's name or likeness; (2) to the defendant's own benefit; (3) without consent. *Id.* The tort created a right "in the nature of a property right" by protecting "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others." *Id. § 652C cmt. a*. Accordingly, the common law did not require a plaintiff to show injury separate and apart from misappropriation, such as losing the economic value **[*17]** of one's name. Rather, it acknowledged that a person was harmed by the mere misuse of their name or likeness. *See id. § 652C cmts. a*, b. For instance, one of the Restatement's illustrations is: "Without the consent of A, B signs A's name to a telegram that he sends to the governor of the state, urging the governor to veto a bill that B finds objectionable." *Id. § 652C cmt. b, illus. 5*. The Restatement did not contemplate that A needed to support the bill, be distressed by having his name attached to the telegram, or otherwise suffer injury separate from the misappropriation. *See id.* Instead, the cause of action existed because (1) B used A's likeness without A's consent and (2) the use of A's likeness benefited B.

Judge therefore plausibly alleges a concrete injury by alleging a California statutory right of publicity claim. Such a claim requires showing: (1) use of the plaintiff's identity; (2) appropriation of their name or likeness to the defendant's commercial advantage; (3) a direct connection between the use and commercial purpose; (4) lack of consent; and (5) resulting injury. Eastwood v. Superior Ct., 149 Cal. App. 3d 409, 417-18, 198 Cal. Rptr. 342 (1983) (citing *Cal. Civ. Code § 3344*). Thus, a *Section 3344* claim necessarily requires showing each element of a common-law claim. In turn, a plaintiff raising a claim under *Section 3344* must **[*18]** have suffered a concrete injury since the harm they suffered would have been actionable at common law. *See* Popa, 153 F.4th at 791; *see also* Carrera v. Whitepages, Inc., No. 2:24-CV-01408-JHC, 2025 U.S. Dist. LEXIS 124213, 2025 WL 1796574, at *5 (W.D. Wash. June 30, 2025) (reaching similar conclusion over standing to assert right of publicity claims). The few cases concluding *Section 3344* plaintiffs do not inherently experience concrete harm did not consider whether such a plaintiff would have a claim at common law. *See, e.g.,* Callahan v. Ancestry Inc., No. 20-CV-08437-LB, 2021 U.S. Dist. LEXIS 112036, 2021 WL 2433893, at *4 (N.D. Cal. June 15, 2021).

Academia contends that Judge needed to specify how its Mentions service injured him. But as previously discussed, a common-law claim did not require injury separate and apart from the defendant's beneficial appropriation of the plaintiff's name or likeness. To the extent that Academia argues Judge did not allege *statutory* injury because he did not allege his name had economic value, California courts recognize that even "unauthorized

appropriation of an obscure plaintiff's name" would violate *Section 3344* because the statute "is not limited to celebrity plaintiffs." *See* *KNB Enters. v. Matthews, 78 Cal. App. 4th 362, 367, 92 Cal. Rptr. 2d 713 (2000)*. Accordingly, Judge did not need to plead more than his existing allegations that, without his consent, Academia used his name to solicit paid subscriptions to its Mentions service. *See* FAC ¶¶ 14, 17-23, 25. These allegations would support a claim at common law, so **[*19]** Judge plausibly alleges a concrete injury.

**B. Consent**

Academia also seeks dismissal because Judge consented to use of his name under the Terms of Use and through social media posts. A California statutory right of publicity claim requires proving lack of consent. *Cal. Civ. Code § 3344(a)(1)*. Under general California contract law, consent must be "actual," meaning that "the disclosures must 'explicitly notify' users of the conduct at issue. *Calhoun v. Google, LLC, 113 F.4th 1141, 1147 (9th Cir. 2024)* (citation omitted). So if a user "could have plausibly understood the disclosures 'as *not* disclosing that [the defendant] would engage in particular conduct,'" there is no consent. *Id.* (quoting *In re Facebook, Inc., Consumer Priv. User Profile Litig., 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019)*). Dismissal cannot be obtained based on consent if the provision purporting to give consent is "reasonably susceptible to more than one interpretation, with one of those interpretations suggesting consent and another belying it." *In re Facebook, 402 F. Supp. 3d at 789*.

As an initial matter, the Court already concluded that Judge did not agree to the Terms of Use. If he agreed to those terms at all, his agreement was limited to terms concerning Academia's use of personal information shared by Google. *See supra* Section II.A. Whether Google shared Judge's name with Academia is not clear, so it is also not clear if any agreement **[*20]** could have encompassed use of Judge's name. In light of this uncertainty, this Order continues to analyze consent under the Terms of Use.

Academia's Terms of Use argument proceeds as follows: the 2015 Terms define "Content" as "text, graphics, images, music, software, audio, video, information or other works of authorship," "Services" as its "social networking service," and "Member Content" as "Content that a Member posts, uploads, publishes, submits or transmits to be made available through the Site or Services." Dkt. No. 42-4 at 2. Then, the Terms grant Academia permission to "use your Member Content in connection with operating and providing the Services and Content to you and to other Members." *Id.* at 3. Finally, the Terms require the user to warrant "neither the Member Content nor . . . Academia.edu's use of the Member Content (or any portion thereof) on, through or by means of the Site or Services will infringe, misappropriate or violate . . . rights of publicity or privacy." *Id.* From these sections of the Terms, Academia contends (1) Judge's name is Member Content; (2) sending out the advertisements described in his complaint would constitute "use" of Member Content "in connection **[*21]** with operating and providing the Services," which Judge allowed Academia to do; and (3) Judge agreed such a use would not infringe upon his right of publicity.

Academia's argument falls with its first premise. It is at best ambiguous whether Member Content includes a user's name. First, Content is defined as "text . . . information . . . or other works of authorship." *Id.* at 2. If something must be a "work[] of authorship" to be Content, it is not clear how a name could fall into that category. *See id.* Second, other parts of the Terms appear to distinguish Member Content from "personal information" disclosed during the registration process. The Terms state that "[i]n order to . . . post any Member Content on the Site . . . you must register to create an account." *Id.* The Terms then disclose that if a user registers through a social media service ("SNS"), "we will extract the personal information you have provided to the SNS (such as your 'real' name . . .) . . . and use that information to create your Account." *Id.* Accordingly, the Terms contemplate that a user's "'real' name" is personal information, a seemingly distinct category from Member Content. *See id.* That interpretation is **[*22]** supported by Member Content being defined as content that "a Member . . . submits." *See id.* If a user is not a Member until they "complete[] Academia.edu's account registration process," they were not a Member at the time they provided their real name. *See id.* Since the Terms are at least "reasonably susceptible" to the interpretation that Judge's name is not Member Content, Academia cannot prevail based on the theory that Judge's allegations involve a permissible use of Member Content. *See In re Facebook, 402 F. Supp. 3d at 789*.

Nor can Academia rely on implied consent. First, Academia points to Judge's social media posts. Dkt. No. 43-1. Since they were not included in Judge's complaint and are "subject to varying interpretations," they cannot be judicially noticed. *See* *Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1000 (9th Cir. 2018)*. Even if considered, Academia did not provide any evidence it was aware of those posts when it sent out advertisements with Judge's name. *Cf.* *Newton v. Thomason, 22 F.3d 1455, 1458, 1461 (9th Cir. 1994)* (finding implied consent based on plaintiff's letter to defendant stating he was "flattered that you are using my name" and thought the use was "exciting"). Finally, Judge's routine use of the Mentions service does not demonstrate implied consent to using his name to advertise that service. *Cf.* *Jones v. Corbis Corp., 815 F. Supp. 2d 1108, 1114 (C.D. Cal. 2011)* (finding implied **[*23]** consent based on a custom "well understood in the entertainment industry"), *aff'd*, *489 F. App'x 155, 157 (9th Cir. 2012)*.

**C. *Section 230***

*Section 230 of the Communications Act of 1934*, enacted by the *Communications Decency Act*, protects "apps and websites which receive content posted by third-party users (i.e., Facebook, Instagram, Snapchat, LinkedIn, etc.) from liability for any of the content posted on their services." *Est. of Bride ex rel. Bride v. Yolo Techs., Inc., 112 F.4th 1168, 1175 (9th Cir. 2024)*, *cert. denied*, *145 S. Ct. 1435, 221 L. Ed. 2d 558 (2025)*. This immunity attaches unless the website is "'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1162 (9th Cir. 2008)* (en banc) (quoting *47 U.S.C. § 230(f)(3)*).

To determine whether a state law claim is preempted by *Section 230*, a court analyzes whether the defendant is: "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100-01 (9th Cir. 2009)*. The third *Barnes* prong excludes instances where the defendant "contributes materially to the alleged illegality of the conduct." *Roommates.com, 521 F.3d at 1168*. Creating "neutral tools," such as "recommendation and notification functions," does not materially contribute to the alleged illegality of conduct. *Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1099 (9th Cir. 2019)*. But a website is not immune if it helps to develop the content and thereby becomes **[*24]** "much more than a passive transmitter of information provided by others," such as if it requires users to answer questions with prepopulated answers. *Roommates.com, 521 F.3d at 1166*; *see also Lemmon v. Snap, Inc., 995 F.3d 1085, 1093 (9th Cir. 2021)* (plaintiffs' negligent design claim regarding Snap's speed filter did not "rest on third-party content" because it faulted Snap "solely for Snapchat's architecture").

Academia has materially contributed to the alleged unlawfulness of the conduct here. Judge alleges that Academia sends email advertisements to users stating that he has mentioned their work. FAC ¶ 18. The linked webpage in that email informs the user that several papers, "[i]ncluding one written by" Judge, mention the user and asks the user to "Try Premium for $1 and view your Mentions." *Id.* ¶ 19. Additionally, after a user views Judge's profile, Academia is alleged to provide that user with similar promotional advertisements. *Id.* ¶¶ 22-23. Judge therefore alleges that Academia unlawfully packages user-contributed content—his name and purported mention of the user—within its own solicitation to pay for its Mentions service. Thus, Academia "becomes the developer, at least in part, of that information." See *Roommates.com, 521 F.3d at 1166*.

Academia contends that it is providing "notifications **[*25]** [that] truthfully conveyed user-generated citation information created by plaintiff himself." *See* Dkt. No. 52 at 19. Not so. Instead, Academia "transformed the character of Plaintiffs' words . . . and actions into a commercial endorsement to which they did not consent." *See* *Fraley v. Facebook, Inc., 830 F. Supp. 2d 785, 802 (N.D. Cal. 2011)*; *see also* *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d 809, 833 n.22 (N.D. Cal. 2023)* (noting that a defendant would not be entitled to immunity for notifications if those notifications "altered the content in a material way"). The advertisements disseminate Academia's own message (subscribe to our Mentions service) with only a vague reference to user-generated content. As such, they are not akin to simply "disseminating the same content in essentially the same format to a search engine." *See* *Kimzey v. Yelp! Inc., 836 F.3d 1263, 1270 (9th Cir. 2016)*.

Section 230 does not allow a website to cloak its own advertisements as user-created content and thereby evade state-law liability.

**D. Public Affairs Exception**

Academia contends that it used Judge's name in connection with a matter of public affairs, so it is exempt from liability under California's right of publicity statute. The statute excepts a use "in connection with any news, public affairs, or sports broadcast or account, or any political campaign." *Cal. Civ. Code § 3344(d)*. The prototypical use that falls into this exception **[*26]** is a news report, though courts also find the exception applies more generally when information is presented about public affairs. *See, e.g., New Kids on the Block v. News Am. Pub., Inc., 971 F.2d 302, 310 (9th Cir. 1992)* (finding exempt a poll using band name in connection with concurrent articles on the band); *Gionfriddo v. Major League Baseball, 94 Cal. App. 4th 400, 416, 114 Cal. Rptr. 2d 307 (2001)* (applying exception to Major League Baseball's websites, documentaries, and game day programs). An "advertisement" does not qualify for this exception. *Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 416 (9th Cir. 1996)*. But the mere fact that the likeness was used to make a profit does not turn it into an advertisement. *See Montana v. San Jose Mercury News, Inc., 34 Cal. App. 4th 790, 797 n.2, 40 Cal. Rptr. 2d 639 (1995)*; *Gionfriddo, 94 Cal. App. 4th at 411*. Nevertheless, a likeness used only as "window-dressing" to support an advertisement does not receive statutory protection. *Downing v. Abercrombie & Fitch, 265 F.3d 994, 1002 (9th Cir. 2001)*.

Academia's use of Judge's name does not qualify for the public affairs exception. The advertisements communicate minimal information: only that Judge referenced someone's work in an unspecified paper. One can hardly call that a "public affairs . . . broadcast or account." *See Cal. Civ. Code § 3344(d)*. Rather, use of Judge's name is "window-dressing" for Academia's advertisement. *See Downing, 265 F.3d at 1002*; *Abdul-Jabbar, 85 F.3d at 416*. Even assuming that Judge's citation to other individuals' work is a matter of public affairs, Academia's "*commercial use* of those actions . . . removes them from the scope of *§ 3344(d)*." *See Fraley, 830 F. Supp. 2d at 805*. These advertisements are separate **[*27]** from Academia's Mentions service, unlike cases analyzing commercial speech (a distinct question) finding the speech "*is* the product." *See, e.g., Hilton v. Hallmark Cards, 599 F.3d 894, 899, 905 n.7 (9th Cir. 2010)* (greeting cards); *Aldrin v. Topps Co. Inc., No. 10-CV-09939-DDP, 2011 U.S. Dist. LEXIS 110800, 2011 WL 4500013, at *1, *3 (C.D. Cal. Sept. 27, 2011)* (trading cards).

**E. Anti-SLAPP Motion**

Relying on the previously discussed arguments, Academia also seeks dismissal under California's anti-SLAPP statute. That statute protects defendants from "'lawsuits brought primarily to chill' the exercise of speech and petition rights." *FilmOn.com Inc. v. DoubleVerify Inc., 7 Cal. 5th 133, 142, 246 Cal. Rptr. 3d 591, 439 P.3d 1156 (2019)* (quoting *Cal. Civ. Proc. Code § 425.16(a)*). When an anti-SLAPP motion is premised on "alleged deficiencies in the plaintiff's complaint," the motion is "treated in the same manner as a motion under *Rule 12(b)(6)* except that the attorney's fee provision of *§ 425.16(c)* applies." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress, 890 F.3d 828, 834 (9th Cir. 2018)* (citation omitted). However, before assessing the merits of the anti-SLAPP motion, "a court must consider any claims by the plaintiff that a statutory exemption contained in *section 425.17* applies." *Batis v. Dun & Bradstreet Holdings, Inc., 106 F.4th 932, 936 (9th Cir. 2024)* (quoting *Takhar v. People ex rel. Feather River Air Quality Mgmt. Dist., 27 Cal. App. 5th 15, 24, 237 Cal. Rptr. 3d 759 (2018)*).

Judge contends that the public interest exemption applies. *Cal. Civ. Proc. Code § 425.17(b)*. Under this exemption, an anti-SLAPP motion is unavailable in an "action brought solely in the public interest or on behalf of the general public" if (1) the plaintiff does not seek relief different from the rest of a class; (2) the action would enforce an "important right affecting **[*28]** the public interest"; and (3) "[p]rivate enforcement is necessary and places a disproportionate financial burden on the plaintiff." *Id.* The Ninth Circuit recently found this exception applied to a putative class action alleging right of publicity claims against a business-to-business database. *Batis, 106 F.4th at 934, 936-38*. There, the lawsuit enforced an important right affecting the public interest because it intersected with

"California's public policy goal of protecting an individual's right to control the use of his or her persona." *Id. at 937*. *Batis* is on four corners with this case and compels concluding that the public interest exemption facially applies.

Academia argues that an exception to the exemption applies. The public interest exemption does not apply to "any person engaged in the dissemination of ideas or expression in any book or academic journal, while engaged in the gathering, receiving, or processing of information for communication to the public." *Cal. Civ. Proc. Code § 425.17(d)(1)*. This was intended to "preserve[] the application of the anti-SLAPP law to actions against individuals that implicate important forms of protected speech"—particularly when those actions are against "the news media and other media defendants." *Major v. Silna, 134 Cal. App. 4th 1485, 1496-97, 36 Cal. Rptr. 3d 875 (2005)*. The protection extends **[*29]** past the media to "actions against persons or entities based on the creation or promotion of constitutionally protected artistic works and the like." *Id. at 1497* (emphasis removed). But the complained of activity must be "done in furtherance" of the relevant party's "gathering, receiving, or processing of information for communication to the public." *San Diegans for Open Gov't v. San Diego State Univ. Rsch. Found., 13 Cal. App. 5th 76, 98, 218 Cal. Rptr. 3d 160 (2017)*.

This exception to the exemption does not apply here because Academia's conduct is dissimilar to that of non-author entities generally protected by this exception.[4] One court applied this exception to agreements between media entities regarding leasing property and sharing other reporting-related resources. *Id. at 85-86, 98-100*. Another court applied a related exception to a publisher of literature. *Stutzman v. Armstrong, No. 2:13-CV-00116-MCE, 2013 U.S. Dist. LEXIS 129204, 2013 WL 4853333, at *9-13 (E.D. Cal. Sept. 10, 2013)*. But Academia is not the author of academic articles, nor is it the publisher of those articles. Rather, it redistributes articles. And the conduct complained of here does not directly result from Academia redistributing the articles, but instead from advertisements for its Mentions service that tease how other authors have mentioned someone's work. This would be akin to a news clipping service sending advertisements to businesses stating that the business was mentioned **[*30]** in an unidentified article and asking the business to subscribe to their service. Even though Academia disseminates academic articles, it is not "engaged in the gathering, receiving, or processing of information for communication to the public" by advertising its services. *See* *Cal. Civ. Proc. Code § 425.17(d)(1)*.

## IV. MOTION TO STRIKE

Under *Federal Rule of Civil Procedure 12(f)*, a court can "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Such a motion is intended to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010)*. *Rule 12(f)* motions are "generally disfavored" since they impose a "drastic remedy." *Lee v. City of San Jose, 701 F. Supp. 3d 935, 937 (N.D. Cal. 2023)*.

### A. Statutory Damages

Academia moves to strike the portion of Judge's Prayer for Relief that seeks statutory damages. Academia argues that Judge is precluded from seeking statutory damages because he fails to allege mental anguish. However, "*Rule 12(f)* does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law." *Whittlestone, 618 F.3d at 974-75*. Accordingly, even assuming Academia is correct, striking Judge's prayer for statutory damages would be inappropriate. *See id.*; *Vox Network Sols., Inc. v. Gage Techs., Inc.,*

---

[4] This is a close call considering the sparsity of authority applying *Section 425.17(d)(1)* and the inherent tension between preventing "corporate abuse" of anti-SLAPP motions and recognizing that some corporations engage in "important forms of protected speech." *See* *Major, 134 Cal. App. 4th at 1496-97*. Accordingly, Academia's anti-SLAPP motion is not frivolous, so Judge's request for an award of costs and attorney's fees is denied. *See* *Cal. Civ. Proc. Code § 425.16(c)(1)*.

*No. 22-CV-09135-AMO, 2025 U.S. Dist. LEXIS 57987, 2025 WL 929939, at *8 (N.D. Cal. Mar. 27, 2025)* (collecting cases **[*31]** declining to strike prayers for relief).

**B. Sister State Class Allegations**

Academia also moves to strike Judge's out-of-state class allegations because he purportedly lacks standing to bring these claims. While Academia styles this as a *Rule 12(f)* motion, it seems to be moving under *Rule 23(d)*, which allows a court to "require that the pleadings be amended to eliminate allegations about representation of absent persons." *Fed. R. Civ. P. 23(d)(1)(D)*. Courts in the Ninth Circuit have customarily concluded that "a plaintiff in a putative class action lacks standing to assert claims under the laws of states other than those where the plaintiff resides or was injured." *Jones v. Micron Tech. Inc., 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019)*. Under this view, when a plaintiff attempts to assert a claim under another state's laws, they "technically invoke different legally protected interests." *Id. at 909* (citing *Restatement (Second) of Torts § 7 cmt. a (A.L.I. 1965)*). Since a plaintiff must show standing for every claim they raise, they "do not have standing to bring claims under the laws of states where they have alleged no injury, residence, or other pertinent connection." *Id.*

However, after the Ninth Circuit's decision in *Melendres v. Arpaio, 784 F.3d 1254, 1261-64 (9th Cir. 2015)*, a "growing minority of courts" have held that "whether a named plaintiff can represent class members whose claims arise under the laws of different **[*32]** states is not a standing question." *Sultanis v. Champion Petfoods United States Inc., No. 21-CV-00162-EMC, 2021 U.S. Dist. LEXIS 145293, 2021 WL 3373934, at *5 (N.D. Cal. Aug. 3, 2021)*. These courts conclude that a plaintiff raising a sister-state claim "does not . . . seek to raise a claim under the laws of a different state; rather, [they] seek[] to represent a class member who can raise such a claim." *Patterson v. RW Direct, Inc., No. 18-CV-00055-VC, 2018 U.S. Dist. LEXIS 198887, 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018)*. Accordingly, whether a sisterstate claim can be asserted in the case is "a matter of typicality, adequacy, and predominance under *Rule 23*, not Article III standing." *Sultanis, 2021 U.S. Dist. LEXIS 145293, 2021 WL 3373934, at *6*.

The approach of the growing minority is more persuasive. Since "one individual does not have standing to claim injury to another individual," it is logical to think of the standing analysis as individualized to the claim they assert on their own behalf. *See* *In re McCormick & Co., Inc., 217 F. Supp. 3d 124, 144 (D.D.C. 2016)*. Judge is not attempting to assert a claim for himself under the laws of states other than California. FAC ¶ 40. Rather, he asserts a claim under California law for himself and seeks to represent absent putative class members who would have a claim under either Alabama, California, Hawaii, Illinois, Nevada, Ohio, South Dakota, or Washington law. Moreover, even assuming a plaintiff must demonstrate standing for claims that flow through them on behalf of absent individuals, the injury demonstrating Article III standing is the **[*33]** same regardless of whether a plaintiff tries to assert a claim under, for example, California law or Washington law. Deciding if a plaintiff injured in California could raise a claim under Washington law is a question of extraterritoriality, which is a "merits question" and not one of subject-matter jurisdiction. *See* *Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 253-54, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010)*. Accordingly, a plaintiff seeking to represent absent parties must demonstrate that they are an appropriate representative for those parties under *Rule 23*, but not that they could themselves bring the claims of those absent parties. So whether Judge can represent absent putative class members is a question of class certification, not standing.

Of course, a court retains discretion to "conclude at the pleadings stage that [the named plaintiff] does not satisfy the adequacy, typicality, or predominance requirements." *See* *Sultanis, 2021 U.S. Dist. LEXIS 145293, 2021 WL 3373934, at *7*. But since Academia's motion does not discuss the *Rule 23* requirements, it would be premature to consider narrowing the putative class at this stage.

**V. MOTION FOR PROTECTIVE ORDER**

Judge moves for a protective order under *Federal Rule of Civil Procedure 23(d)* to remedy Academia's purportedly misleading communications with the putative class. Under *Rule 23(d)*, "a district court has both the duty and the broad authority **[*34]** to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard, 452 U.S. 89, 100, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981)*. It should do so based on a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id. at 101*. This authority extends to the "cancellation of improperly obtained contracts," including allowing a court to "refuse to enforce an arbitration agreement." *Avery v. TEKsystems, Inc., 165 F.4th 1219, 1228 (9th Cir. 2026)*. A court should generally invoke *Rule 23(d)*'s authority to remedy "misleading" communications that have a "harmful impact on potential class members." *Id. at 1231*. Such a determination can be made through a "careful examination of the defendant's communications" without additional evidence. *Id. at 1232* (citing *Dominguez v. Better Mortg. Corp., 88 F.4th 782, 791-92 (9th Cir. 2023)*). An omission of important information is sufficient for a communication to be misleading. *See id. at 1233*.

### A. Misleading Communications

After this action began, Academia updated its Terms of Use. It sent an email announcing these changes to its users on September 17, 2025:

> We're updating our Terms of Use and Privacy Policy to support our evolving business and new features, and to address upcoming laws and regulations.
>
> We encourage you to review the updated Terms of Use **[*35]** here and the updated Privacy Policy here. By using your account you agree to these updated Terms of Use and Privacy Policy.
>
> Thank you for being a valued member of our community.
>
> The Academia.edu Team
>
> Dkt. No. 27-1 at 2.

When one of Judge's attorneys clicked the Terms of Use link in that email, it logged them into Academia as Judge, even though they had "never been provided with or used Plaintiff's login information." Dkt. No. 27 ¶ 3. Additionally, users must click an "Agree" button referencing the Terms of Use before continuing to use Academia. Dkt. No. 26 at 10-12; Dkt. No. 35 at 22.[5]

Academia substantively changed its Terms of Use in numerous ways, most of which appear unrelated to this litigation. For instance, it reworded the dispute resolution section, which already required users to arbitrate disputes. Dkt. No. 27-6 at 13-16. At issue here is a new term granting Academia permission to "use your Member Content and your personal information (including, but not limited to, your name, voice, signature, photograph, likeness, city, institutional affiliations, citations, mentions, publications, and areas of interest) in any manner, including for the purpose of advertising, **[*36]** selling, or soliciting the use or purchase of Academia.edu's Services." *Id.* at 6-7. A few days later, Academia revised that term so that users grant permission to "display your profile information (e.g., your name, city, institutional affiliations, and areas of interest) to other Academia.edu accountholders, including in connection with promoting Academia.edu's services and features" without granting "Academia.edu any ownership rights in your profile information, which remains yours." Dkt. No. 36 ¶¶ 11-12; Dkt. No. 36-9 at 7.

These communications were misleading and impacted the putative class's claims. First, Academia did not disclose that many users were not previously subject to the Terms of Use, and accordingly not subject to an arbitration agreement. As analyzed in this Order, Judge is one such user. For those users, continuing to use Academia would

---

[5] Academia objects to the consideration of social media posts submitted by Judge, intended to show that users must now click they "Agree" to the Terms of Use. Since Academia concedes that it changed the assent process in this way, Academia's objection is **OVERRULED AS MOOT**.

likely extinguish their ability to participate in this class action, as they would have to agree to the Terms of Use, including its arbitration provision, and therefore seemingly be required to arbitrate their claims instead. Yet Academia's communications did not disclose that. Allowing Academia to shunt parts of the putative class **[*37]** into arbitration would "subvert[] *FRCP 23* by turning this typical *Rule 23* opt-out class proceeding into an opt-in proceeding." *See* *Avery, 165 F.4th at 1228*. Second, since clicking the Terms of Use link in Academia's email logged a user into the website, simply clicking that link seemed to constitute "using your account" and therefore consent to the updated Terms of Use. *See* Dkt. No. 27 ¶ 3; Dkt. No. 27-1 at 2. But Academia's email did not disclose that. Finally, the new term concerning use of one's name for advertising would seem to shore up Academia's consent argument against right of publicity claims. As a result, potential claims, such as those raised by this lawsuit, could be extinguished. Academia did not disclose to users that they might not be able to receive relief from this lawsuit if they agreed to the updated Terms of Use.

It is hard to see these changes as anything but targeted at this lawsuit. This lawsuit identified that users might not have consented to use of their name in advertising and might not have agreed to the Terms of Use or arbitration. After Judge filed suit, Academia imposed changes shoring up those deficiencies. And Academia refuses to say it will not rely on these changes in this lawsuit. Dkt. **[*38]** No. 27 ¶ 4. The fact that these changes occurred simultaneously with numerous unrelated changes does not cleanse their harmful effect to make them "routine amendments to the[] terms of service." *See* *Haider v. Lyft, Inc., No. 20-CV-2997-AJN, 2021 U.S. Dist. LEXIS 147975, 2021 WL 3475621, at *3 (S.D.N.Y. Aug. 6, 2021)*. Moreover, the absence of extreme coercion or vulnerability does not counsel against intervention here, since there is evidence that Academia targeted the putative class's claims and made misleading communications. *See Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 263-64 (S.D.N.Y. 2020)*, *objections overruled*, *2021 U.S. Dist. LEXIS 175593, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021)*. In sum, a *Rule 23(d)* order is appropriate.

**B. Remedy**

The clearest remedy for Academia's misleading communications is to bar Academia from relying on the Terms of Use changes, including any associated changes to the agreement process, in this case as to Academia's conduct before September 17, 2025 (the date of those changes). This remedy is "necessary to be consistent with *FRCP 23* as it restores the opt-out process as the default." *See* *Avery, 165 F.4th at 1233*. Academia contends that it is premature to issue such an order since a class might not be certified, but *Rule 23(d)* indisputably allows orders limiting communications with "potential" class members. *See* *Gulf Oil, 452 U.S. at 101*. Since Judge has already demonstrated the necessity of a *Rule 23(d)* order, it would be inefficient and potentially harmful to the class to delay providing **[*39]** a remedy until class certification. *See* *McKee v. Audible, Inc., No. 17-CV-1941-GW(Ex), 2018 U.S. Dist. LEXIS 179978, 2018 WL 2422582, at *7 (C.D. Cal. Apr. 6, 2018)* (noting "a defendant attempting to influence potential plaintiffs not to join an embryonic class action would be just as damaging to the purposes of *Rule 23* as a defendant that influences members of an already-certified class" (citation omitted)). Similarly, though Academia argues that the Terms of Use changes might not impact this case, it never disclaims an intent to later raise those changes. Barring Academia from retrospectively relying on these changes in this litigation is appropriate.

It is a harder question if additional remedies should be imposed. Judge initially asked for corrective notice to the putative class members but conceded at oral argument that this relief would be unnecessary if the Terms of Use changes could not be used in this case. Judge continues to ask for an order requiring Academia to consult with his attorneys before communicating with putative class members concerning this case or in a way that is intended to be used in this case. But such an order would not be the "narrowest possible relief which would protect the respective parties." *See* *Gulf Oil, 452 U.S. at 102* (citation omitted). First, this Order puts Academia on notice that its behavior violated **[*40]** *Rule 23(d)*. That should deter any future *Rule 23(d)* violations; if not, they will be met with increasingly severe remedies. Second, Judge has shown his ability to police Academia's communications with the putative class and raise their propriety with the Court for appropriate action. Finally, Academia affirmed at oral argument that it "d[id] not intend to issue anything that would approach misleading in the future." Dkt. No. 62 at 23. Weighing these considerations with the ever-present necessity for a large website to communicate with its users, any restrictions on Academia's communications would likely be unduly burdensome at this juncture. *Cf.* *Haider,*

*2021 U.S. Dist. LEXIS 147975, 2021 WL 3475621, at *3* (noting that *Rule 23(d)* "does not of its own force prohibit all communication with potential class members that might affect ongoing litigation").

To summarize, Judge's motion for a protective order is **GRANTED IN PART** insofar as Academia cannot rely on the Terms of Use changes to retrospectively limit putative class members' claims in this case. It is otherwise **DENIED**.

**VI. CONCLUSION**

For the foregoing reasons, Academia's motion to compel arbitration, or alternatively to dismiss and strike, is **DENIED**. Judge's motion for a protective order is **GRANTED IN PART** and **DENIED IN PART [*41]** . The Court **SETS** an initial case management conference for **June 11, 2026**. The parties **SHALL** file an initial case management statement no later than noon on **June 4, 2026**.

**IT IS SO ORDERED**.

Dated: May 7, 2026

/s/ Araceli Martínez-Olguín

ARACELI MARTÍNEZ-OLGUÍN

United States District Judge

End of Document