# Gustin v. Club Demonstration Servs.

United States District Court for the Eastern District of California

July 6, 2026, Decided; July 6, 2026, Filed

Case No. 1:25-cv-00579 JLT FJS

**Reporter**
2026 U.S. Dist. LEXIS 148507 *; 2026 LX 345739; 2026 WL 1948873

WILLIAM GUSTIN, Plaintiff, v. CLUB DEMONSTRATION SERVICES, INC. et al., Defendants.

**Counsel:** **[*1]** For William Gustin, an individual, on behalf of himself and on behalf of all persons similarly situated, Plaintiff: Aparajit Bhowmik, LEAD ATTORNEY, Blumenthal, Nordrehaug & Bhowmik, La Jolla, CA; Jeffrey S. Herman, Nicholas J. De Blouw, LEAD ATTORNEYS, Blumenthal Nordrehaug Bhowmik De Blouw LLP, San Diego, CA; Kyle R. Nordrehaug, LEAD ATTORNEY, Blumenthal Nordrehaug Bhowmik De Blouw LLP, La Jolla, CA; Norman Blumenthal, LEAD ATTORNEY, Blumenthal Nordrehaug & Bhowmik, LLP, La Jolla, CA; Sergio Julian Puche, LEAD ATTORNEY, Blumenthal Nordrehaug Bhowmik & De Blouw, La Jolla, CA; Trevor Girard Moran, LEAD ATTORNEY, Blumenthal Nordrehaug Bhowmik DE Blouw LLP, La Jolla, CA.

For Club Demonstration Services, Inc., a Corporation, Defendant: Aja Nunn, LEAD ATTORNEY, Paul Hastings, Employment Law, CA, CA; Chris A. Jalian, Paul Hastings LLP, Los Angeles, CA.

**Judges:** Jennifer L. Thurston, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Jennifer L. Thurston

## Opinion

ORDER DENYING MOTION TO REMAND AND DENYING MOTION TO COMPEL ARBITRATION

(Docs. 12, 21)

William Gustin moves to remand the case to the state superior court, where he originally filed it. (Doc. 12.) Defendant Club Demonstration Services, Inc. (CDS) moves to compel arbitration **[*2]** of Gustin's claims and to dismiss the case. (Doc. 21.) Both motions are **DENIED**, as explained in this order.

### BACKGROUND

Gustin's describes CDS's business as providing "in-store marketing for Costco." (Doc. 1-2 at 3.) He worked for CDS from 2021 to 2024 as an hourly, non-exempt employee. (*Id.*) In this case, he asserts several wage and hour claims and asks to represent a class of similarly situated employees. (*Id.*) He alleges, for example, that CDS had a policy of rounding its employees' time sheets so that they were paid for less time than they actually worked. (*See id.* at 5.) He also alleges that the company required its employees to complete temperature checks and health questionnaires but did not pay them for the time they spent on these tasks. (*See id.*)

Gustin originally filed this case in the Fresno County Superior Court. (*See id.* at 2.) CDS removed the case to this Court based on the jurisdictional provisions in 28 U.S.C. § 1332(d), commonly cited as the *Class Action Fairness Act* or "CAFA." (*See id.* at 1.) According to a declaration by a human resources director, the company's records showed that it had more than 8,000 non-exempt employees in California over the relevant time. (Doc. 1-10 at 2-3.) Together, **[*3]** these employees logged hundreds of thousands of workweeks. (*Id.* at 3.) CDS alleged that it is a citizen of Connecticut and Missouri, and it alleged that Gustin is a citizen of California. (*See* Doc. 1 at 5-6.) Based

on these allegations, and citing the minimum wage that applied at the time, CDS estimated that just two of Gustin's claims put more than $12 million in controversy, more than double the $5 million threshold. (*See id.* at 8-10.)

Gustin has moved to remand the case to state court. (Doc. 12.) He argues that CDS relied on unreasonable assumptions and calculations when it estimated the amount in controversy. He does not dispute CDS's allegations about the number of class members or the parties' citizenships. CDS opposes his motion, and briefing is complete. (*See* Docs. 18-19.)

CDS has also filed a motion. It asks the Court to compel Gustin to arbitrate his claims on an individual basis and to dismiss this case. (*See* Doc. 21.) That motion is now also fully briefed. (*See* Docs. 21-1, 23, 27.)

The parties have both filed notices of supplemental authority. (*See* Docs. 32, 34.) The Court has considered the cases they cited, but not the arguments they included with their notices. *See* L.R. 230(m)(2). The **[*4]** Court determined that oral arguments would not be necessary for any of the pending matters. (*See* Docs. 15, 29.)

## REMAND

Federal law allows a defendant to remove a case from a state court to the appropriate federal district court if that court would have had jurisdiction originally. *28 U.S.C. § 1441(a)*. To accomplish the removal, the defendant must file a notice in the federal district court, which must contain among other things "a short and plain statement of the grounds for removal." *Dart Cherokee Basin Operating Co., LLC v. Owens, 574 U.S. 81, 83, 135 S. Ct. 547, 190 L. Ed. 2d 495 (2014)* (quoting *28 U.S.C. § 1446(a)*). It is not necessary for the defendant to submit evidence with this notice. Plausible allegations suffice. *See Arias v. Residence Inn by Marriott, 936 F.3d 920, 927 (9th Cir. 2019)*.

If the plaintiff contests the defendant's allegations about the amount in controversy, then that defendant must prove "by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million," i.e., that the amount in controversy is more likely to exceed the $5 million threshold than to fall short of it. *Ibarra v. Manheim Invs., Inc., 775 F.3d 1193, 1197 (9th Cir. 2015)*. The defendant can, for example, offer declarations, exhibits, and other "summary-judgment-type evidence." *Id.* A defendant can also rely on reasonable assumptions, including those based on the plaintiff's own allegations. *Harris v. KM Indus., Inc., 980 F.3d 694, 701 (9th Cir. 2020)*; *Arias, 936 F.3d at 926-27*. It may not rely on speculation or conjecture, however, **[*5]** nor assumptions "pulled from thin air." *Ibarra, 775 F.3d at 1199*. An assumption must have "some reasonable ground" beneath it. *Id.* Plaintiffs may respond by submitting their own evidence in reply or by arguing that the defendants' assumptions are not unreasonable. *See Harris, 980 F.3d at 699*. The court then weighs the evidence, considers whether the defendant's assumptions are reasonable, and decides whether the amount in controversy is more likely to exceed the jurisdictional threshold than to fall short of it. *See id. at 701*.

The question is not whether the plaintiff will probably recover any particular amount of money or secure some particular injunction. *See* *Chavez v. JPMorgan Chase & Co., 888 F.3d 413, 417 (9th Cir. 2018)*. Courts cannot demand that a defendant predict the "eventual award with one hundred percent accuracy." *Jauregui v. Roadrunner Transp. Servs., Inc., 28 F.4th 989, 993 (9th Cir. 2022)* (quoting *Valdez v. Allstate Ins. Co., 372 F.3d 1115, 1117 (9th Cir. 2004)*). Nor is the goal to reach some "prospective assessment of the defendant's liability." *Lewis v. Verizon Communs., Inc., 627 F.3d 395, 401 (9th Cir. 2010)*. The amount is controversy "is simply an estimate of the total amount in dispute." *Id.* If the defendant shows that value is more likely to exceed $5 million than otherwise, it has carried its burden. *See id.*

In wage and hour cases like this one, these standards have prompted sharp disputes about what a defendant can infer from a plaintiff's allegations. This case is an example of that **[*6]** trend. It is relatively rare in practice for a complaint to include the sort of specifics that might permit straightforward calculations of the amount in controversy, such as allegations about how many hours the defendant's employees worked on average, how much they earned per hour, how frequently or how long they normally worked without pay, or how often they were interrupted during their breaks. *See* *Toribio v. ITT Aero. Controls LLC, No. 19-5430, 2019 U.S. Dist. LEXIS 153461, 2019 WL 4254935, at *2 (C.D. Cal. Sept. 5, 2019)*.

Complaints more commonly employ vaguer, qualitative descriptions that have come to be known as "limiting language." *E.g., Banuelos v. Dominos Pizza LLC, No. 24-07085, 2025 U.S. Dist. LEXIS 45311, 2025 WL 786350, at *4 (N.D. Cal. Mar. 12, 2025)*; *Demaria v. Big Lots Stores - PNS, LLC, No. 23-00296, 2023 U.S. Dist. LEXIS 176567, 2023 WL 6390151, at *6 (E.D. Cal. Sept. 29, 2023)*. A plaintiff might allege, for example, that the defendant "routinely" failed to pay its employees all wages due, ***Arias, 936 F.3d at 926***; that there were "periodic shortages" in their compensation, *Rapisura v. BMW of N. Am., LLC, No. 22-00455, 2022 U.S. Dist. LEXIS 88600, 2022 WL 1557001, at *2 (E.D. Cal. May 17, 2022)*; that the alleged violations occurred "at times" and "on occasion," *Cabrera v. S. Valley Almond Co., LLC, No. 21-00748, 2021 U.S. Dist. LEXIS 240881, 2021 WL 5937585, at *8 (E.D. Cal. Dec. 16, 2021)*; or that a defendant had a "policy and practice" of interrupting its employees' lunch breaks, *Lopez v. Bio-Reference Labs., Inc., No. 21-02063, 2022 U.S. Dist. LEXIS 97209, 2022 WL 1744993, at *2 (E.D. Cal. May 31, 2022)*. Gustin relies on this type of language. He alleges, for example, that CDS "regularly" paid him and other members of the proposed class less than they were owed. (Doc. 1-2 at 9.)

Defendants can and do often argue that this type of limiting language makes it reasonable to assume the plaintiff will attempt to prove that violations **[*7]** occurred with some specific minimum frequency—say, at least once or twice per week or for one hour or more out of every forty. ***See, e.g., Arias, 936 F.3d at 926***. CDS relied on this type of reasoning in its removal notice. (*See* Doc. 1 at 8.) Courts have been willing to accept these types of estimates in many cases, at least in the absence of contrary evidence or conflicting allegations within the complaint. ***See, e.g.,*** *Perez, 131 F.4th at 809-10*; *Lopez, 2022 U.S. Dist. LEXIS 97209, 2022 WL 1744993, at *2*.

But as Gustin argues in support of his motion to remand, district courts have also expressed skepticism about this type of logic from time to time. Competing frequency estimates can generate a variety of nominally "reasonable" but practically conflicting interpretations of the same limiting phrases, such that plaintiffs and defendants alike can find authority to support their respective positions. ***See, e.g.,*** *Toribio, 2019 U.S. Dist. LEXIS 153461, 2019 WL 4254935, at *3* (collecting authority). Given the variety of assumptions that might be "reasonable" interpretations of phrases like "at times" or "on occasion," almost any choice can seem somewhat arbitrary. ***See, e.g.,*** *Vanegas v. DHL Express (USA), Inc., No. 21-01538, 2021 U.S. Dist. LEXIS 57255, 2021 WL 1139743, at *3 (C.D. Cal. Mar. 24, 2021)*. The exercise can indeed sometimes seem like a walk through a "mathematical fantasyland." *Aguirre v. BW Packaging Sys. Inc., No. 22-4980, 2023 U.S. Dist. LEXIS 49035, 2023 WL 2605016, at *3 (C.D. Cal. Mar. 22, 2023)* (quoting *Toribio, 2019 U.S. Dist. LEXIS 153461, 2019 WL 4254935, at *3*).

Be that as it may, the Ninth Circuit expressly permits defendants to rely on assumptions **[*8]** about "vague terms" that "may be susceptible to a flexible, broad range of interpretations." *Soto v. Graybar Elec. Co. Inc., No. 24-00520, 2025 U.S. Dist. LEXIS 260012, 2025 WL 3648360, at *4 (E.D. Cal. Dec. 16, 2025)* (citing *Perez, 131 F.4th at 810*). And there is a solution. Plaintiffs who wish to constrain an opposing party's estimates of the amount in controversy can use more specific "limiting language" in their complaints. ***See*** *Perez, 131 F.4th at 810*.

Gustin's complaint fits the pattern described above: generic allegations about his employer's policies and practices and the resulting unpaid wages and missed breaks plus vague limiting language about how often the problems arose. With one exception, his complaint includes no specific allegations about the amount in controversy.

The exception is Gustin's allegation that the amount in controversy is "under $5 million." (Doc. 1-2 at 3.) That allegation appears, in fact, to be designed specifically to deprive this Court of jurisdiction. It cannot accomplish that goal. "That is because a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified." *Standard Fire Ins. Co. v. Knowles, 568 U.S. 588, 593, 133 S. Ct. 1345, 185 L. Ed. 2d 439 (2013)*. Gustin cannot limit the absent members of his proposed class to any specific sum of damages before he represents them under the terms of *Rule 23*. ***See*** *id. at 595-96*.

Estimating the amount in controversy in this case **[*9]** instead requires an assessment of the evidence and whatever assumptions can reasonably be made based on Gustin's allegations:

- He alleges that CDS had a "policy," "practice," or "procedure" that was "uniform" and common to the whole of the proposed class. (***See, e.g.***, Doc. 1-2 at 5.)

- He alleges that the company rounded its employees' time entries so that on paper, they appeared to have worked shorter shifts than they had actually done, depriving them of a few minutes of pay. (*See id.*)

- He also alleges that CDS made its employees submit to temperature checks and complete wellness questionnaires without paying them. (*See id.*)

- Elsewhere in his complaint, he alleges CDS employed these policies in a way that "regularly" resulted in unpaid wages, and thus incorrect wage statements. (*See id.* at 9.)

It would be reasonable to assume from these allegations, as CDS did, that Gustin will attempt to prove that members of the proposed class worked at least a few minutes every day without pay. That would lead to quite a large damages award, given the size of the class he proposes. Just a few minutes of unpaid overtime at the beginning and end of every shift and at the beginning and end of every meal **[*10]** break (i.e., when employees normally clock in and clock out) would lead to an hour of unpaid overtime over the course of every five-day workweek. And based on the thousands of people who worked for CDS over the relevant period and the number of weeks they worked, just an hour of unpaid overtime per week would amount to more than $7 million in unpaid overtime wages over the course of the whole class period. These estimates account for only one of Gustin's multiple claims. CDS has accordingly satisfied its obligation to show that this case is a putative class action between parties with different state citizenships, involves a proposed class with thousands of members, and puts well more than $5 million in dispute. This Court has jurisdiction, and the motion to remand is denied.

**ARBITRATION**

The next question is whether Gustin must pursue his claims in individual arbitration, rather than as part of a class action in court. CDS argues that Gustin signed a written arbitration agreement requiring him to do just that. It moves to compel arbitration under the Federal Arbitration Act.

Written arbitration agreements are "valid, irrevocable, and enforceable," under the FAA, "save upon such grounds as exist at law or in **[*11]** equity for the revocation of any contract." *9 U.S.C. § 2*. A party to an arbitration agreement may petition a federal district court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id. § 4*. The Court's task in response to such a motion begins with two "gateway" questions: (1) "whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank, 796 F.3d 1125, 1130 (2015)*. If there is an enforceable agreement and it covers the claims at hand, then the court must enforce it. *See* *Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000)*.

The Court employs the "ordinary state law principles that govern contract formation" when it decides whether the parties have reached an agreement to arbitrate a particular dispute. *Davis v. Nordstrom, Inc., 755 F.3d 1089, 1093 (9th Cir. 2014)* (citing *Ferguson v. Countrywide Credit Indus., Inc., 298 F.3d 778, 782 (9th Cir. 2002)*). The Court may also consider "generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 340, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011)* (quoting *Doctor's Assocs. Inc. v. Casarotto, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)*). The party moving to compel arbitration bears the burden of demonstrating there is an enforceable arbitration agreement. *Prostek v. Lincare Inc., 662 F. Supp. 3d 1100, 1109 (E.D. Cal. 2023)* (citing *Reichert v. Rapid Invs., Inc., 56 F. 4th 1220, 1227 (9th Cir. 2022)* and *Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014)*). A party opposing arbitration has the burden to demonstrate the claims at issue should not be sent to arbitration. *Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 81, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)*; *see also* *Mortensen v. Bresnan Commc'ns LLC, 722 F.3d 1151, 1157 (9th Cir. 2013)*.

CDS has filed a copy of the agreement Gustin signed. (*See* Doc. 21-3 **[*12]** at 15-18.) By its terms, that agreement applies to claims by an employee or former employee, and it requires arbitration of claims under the California Labor Code and similar laws. (*See id.*) Gustin does not dispute that he signed the agreement, nor that it covers his claims, but he argues the agreement cannot be enforced because it is unconscionable. (*See* Doc. 23 at 6.)

To demonstrate that the agreement is unconscionable, Gustin must show that it is unconscionable in two senses, "both procedurally and substantively," but not necessarily to the same degree. *Heckman v. Live Nation Entertainment, Inc., 120 F.4th 670, 681 (2024)* (citing *Armendariz v. Foundation Health Psychcare Servs., 24 Cal. 4th 83, 114, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000)*). "Ultimately, the question is whether [Gustin], through oppression and surprise, was coerced or misled into making an unfair bargain." *Fuentes v. Empire Nissan, Inc., 19 Cal. 5th 93, 106, 341 Cal. Rptr. 3d 186, 582 P.3d 961, (2026)* (quoting *OTO, L.L.C. v. Kho, 8 Cal. 5th 111, 128, 251 Cal. Rptr. 3d 714, 447 P.3d 680 (2019)*). The Court must consider the contract as it stood at the time it was made. *See* *Ramirez v. Charter Commc'ns, Inc., 16 Cal. 5th 478, 493, 322 Cal. Rptr. 3d 825, 551 P.3d 520 (2024)*.

**I. Procedural Unconscionability**

California courts use a two-part definition of procedural unconscionability. *See* *id. at 681-82*. The first part takes into account any "oppression" caused by "an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Id. at 682* (quoting *Flores v. Transamerica HomeFirst, Inc., 93 Cal. App. 4th 846, 853, 113 Cal. Rptr. 2d 376 (2001)*). The second part, the "surprise" factor, "is a 'function of the disappointed reasonable expectations of **[*13]** the weaker party.'" *Id.* (quoting *Harper v. Ultimo, 113 Cal. App. 4th 1402, 1406, 7 Cal. Rptr. 3d 418 (2003)*). In more practical terms, "contracts that have been freely negotiated by roughly equal parties" are not unconscionable in the procedural sense. *Ramirez, 16 Cal. 5th at 493-94* (quoting *Baltazar v. Forever 21, Inc., 62 Cal. 4th 1237, 1244, 200 Cal. Rptr. 3d 7, 367 P.3d 6 (2016)*). By contrast, when a person with greater bargaining power has presented an agreement to a person with less bargaining power on a "take-it-or-leave-it basis," and when there was "no real negotiation and an absence of meaningful choice," then the agreement is unconscionable in the procedural sense. *Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1281 (9th Cir. 2006)* (en banc) (quoting *Flores, 93 Cal. App. 4th at 853*).

A variety of circumstances might come into play. *See, e.g.,* *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc., 232 Cal. App. 4th 1332, 1348, 182 Cal. Rptr. 3d 235 (2015)* (listing relevant circumstances). Depending on how those circumstances interact, the degree of "oppression" and "surprise" might be significantly higher than in the "garden variety" case. *Heckman, 120 F.4th at 681*. The arbitration agreement in *Heckman* is an example from the extreme end of the spectrum. The defendant (Live Nation) was so dominant in the market for tickets to live concerts that ticket buyers could not realistically expect to see any live concerts at all unless they submitted to the company's allegedly unconscionable contract terms. *See* *id. at 682*. Live Nation had also reserved to itself the power to change the terms of that contract unilaterally, **[*14]** retroactively, and without notice. *See* *id. at 682-83*. To make matters worse, the defendant's website was "affirmatively misleading," and the arbitration agreement referred to a set of rules that was "so dense, convoluted and internally contradictory to be borderline unintelligible." *See* *id. at 682-83*.

Gustin's circumstances were not so extreme, but they were "oppressive" in the relevant sense. He filed a declaration describing his experience. (Doc. 23-1.) CDS gave him "numerous documents" to review and sign during the "onboarding process," and the arbitration agreement was one of them. (*Id.* at 2.) The company allowed him no choice: if he wanted to start working, he had to sign. (*Id.*) And yet no one explained the arbitration agreement, he did not have any chance to ask questions or propose changes to it, and his new supervisor was rushing him. (*See id.* at 2-3.) Even if Gustin had taken the time to read the agreement and ask questions of his new supervisor, the evidence suggests that she could not have answered any of them or approved any changes. (*Id.* at 2-3.) Gustin also felt like he had no bargaining power. (*Id.*) He needed the money. (*Id.* at 3.) Other courts have said that employees in a similar situation faced **[*15]** "oppression." *See, e.g.,* *Lim v. TForce Logistics, LLC, 8 F.4th 992, 1001 (9th Cir. 2021)*.

Next is "surprise." The contract itself has several features that the California Supreme Court has described as "opaque" and "complex." *OTO, 8 Cal. 5th at 128*. Its sentences are long and "filled with statutory references and legal jargon." *Id.* It includes many words—"interrogatories," "bellwether procedures," and "competent jurisdiction," for example—that don't mean very much to most nonlawyers. (*See* Doc. 21-3 at 15-17.) The agreement also includes words that might seem simple enough to a nonlawyer—like "discovery" and "stayed"—but that mean something quite specific and different when they appear in a contract. (*See id.*) The agreement is also long. In total,

it includes more than 1,500 words (not counting the JAMS rules, which it incorporates, and which are even longer[1]). When it is printed on ordinary, letter-sized paper in a twelve-point, singled-spaced typeface with standard margins, it is more than three pages long. (*See id.* at 15-18.) In sum, it is true in this case, as it was in *OTO*, that "[a] layperson trying to navigate this block text . . . would not have an easy journey," even with a printed and easily legible copy at hand. *8 Cal. 5th at 128*. The agreement was "surprising" in terms of California's **[*16]** unconscionability rules. *See Lim, 8 F.4th at 1001*; *OTO, 8 Cal. 5th at 128-29*.

To reiterate, Gusin's circumstances were not as extreme as those that other plaintiffs faced. There is nothing to suggest, for example, that the company presented the arbitration agreement in an illegible format or a foreign language. *See, e.g., Saravia v. Dynamex, Inc., 310 F.R.D. 412, 420 (N.D. Cal. 2015)*; *Fuentes, 19 Cal. 5th at 105*; *OTO, 8 Cal. 5th at 127-29*. But Gustin's circumstances were similar to those that have prompted both state and federal courts to find that an agreement was more than just minimally or slightly unconscionable in the procedural sense, such as time pressure, the absence of any realistic chance to ask questions or negotiate, legalistic language, and complex sentences within a long contract. *See, e.g., Saravia, 310 F.R.D. at 420*; *Fuentes, 19 Cal. 5th at 104-05*; *OTO, 8 Cal. 5th at 127-29*. The California Supreme Court has said as well that the "economic pressure exerted by employers" is an important context that a court must keep in mind. *Armendariz, 24 Cal. 4th at 115*. "Various studies show that arbitration is advantageous to employers not only because it reduces the costs of litigation, but also because it reduces the size of the award that an employee is likely to get, particularly if the employer is a 'repeat player' in the arbitration system." *Id.* The pressure to sign on the dotted line can be "particularly acute" for "all but the most sought-after **[*17]** employees." *Id.* "Given the lack of choice and the potential disadvantages that even a fair arbitration system can harbor for employees, [courts] must be particularly attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable claims as part of an arbitration agreement." *Id.*

The agreement is at least moderately unconscionable in the procedural sense. It is unenforceable if Gustin shows it is at least moderately unconscionable in the substantive sense as well.

### II. Substantive Unconscionability

Substantive unconscionability is a measure of fairness. *See Nagrampa, 469 F.3d at 1257*; *Fuentes, 19 Cal. 5th at 106*. A contract is not unconscionable just because it is "a simple old-fashioned bad bargain." *Sanchez v. Valencia Holding Co., LLC, 61 Cal. 4th 899, 911, 190 Cal. Rptr. 3d 812, 353 P.3d 741 (2015)* (quoting *Schnuerle v. Insight Communs., Co. L.P., 376 S.W.3d 561, 575 (Ky. 2012)*). The terms must be "overly harsh" or generate "one-sided results." *Nagrampa, 469 F.3d at 1257* (quoting *Armendariz, 24 Cal. 4th at 114*). The "paramount consideration" is "mutuality." *Id.* (quoting *Abramson v. Juniper Networks, Inc., 115 Cal. App. 4th 638, 657, 9 Cal. Rptr. 3d 422 (2004)*). The rule is the same in cases about arbitration agreements. They must have at least a "modicum of bilaterality." *Id.* (quoting *Armendariz, 24 Cal. 4th at 117*). Arbitration agreements that are "unfairly one-sided" are unconscionable. *Id.* (quoting *Little v. Auto Stiegler, Inc., 29 Cal. 4th 1064, 1071, 130 Cal. Rptr. 2d 892, 63 P.3d 979 (2003)*).

Gustin argues that several portions of the contract are unfairly one-sided. It is best to begin with one of its broadest and **[*18]** most significant features: the way it combines a class-action waiver with a procedure for resolving many similar arbitration demands.

#### A. Bellwether Arbitration

CDS anticipated the possibility that one of its employees would file a lawsuit like this one, with broad, class-wide labor law allegations about allegedly uniform policies or practices. Rather than resolving thousands of wage and

---

[1] *See* JAMS, Employment Arbitration Rules & Procedures (June 1, 2021), available at https://www.jamsadr.com/rules-employment-arbitration,

hour disputes in class litigation intended to test "the validity of each one of the claims in one stroke," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011), the company decided to rely on individual arbitration. It drafted an arbitration agreement with a class-action waiver: "Claims must be brought by either you," i.e., the employee, "or Company in your or its individual capacity, not as plaintiffs or class members in any purported class or collective proceeding, and the arbitrator shall not have the power to hear the arbitration or award relief as a class or collective action." (Doc. 21-3 at 16.) CDS also decided to make the acceptance of that limitation a mandatory "condition of employment." (Doc. 27 at 7.)

The reasons for that choice are not difficult to understand. Small claims for damages may not be so small when they are aggregated by the thousands. **[*19]** The Supreme Court has recognized that the risk of an adverse decision "will often become unacceptable" to a defendant in a class-wide procedure. AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 350, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011). For that reason, a defendant might feel heavy pressure to settle even "questionable" class claims, despite the safeguards imposed by the federal rules, and despite available appellate review, even immediate "interlocutory" review in some cases. *See id.*; *see also* Fed. R. Civ. P. 23(a)-(b), (f). Claim-by-claim arbitration allows a defendant to take each claim as it comes, to reduce the risk of a single catastrophic loss, to rely on cheaper and faster arbitration procedures, and to prevent some people with valid but relatively small claims from pursuing those claims at all, whether in a court or before an arbitrator. *See, e.g.,* id. at 348-51 (describing the "higher stakes of class litigation" that might require a defendant to "bet the company" on the case and contrasting the relevant federal rules with cheaper and less formal arbitration procedures); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (citation omitted)).

**[*20]** The Supreme Court has confirmed that individual arbitration agreements are permissible and enforceable under the FAA, provided of course that they are otherwise valid. *See generally* Epic Sys. Corp. v. Lewis, 584 U.S. 497, 138 S. Ct. 1612, 200 L. Ed. 2d 889 (2018). But in recent years, individual arbitration requirements have sometimes led to unintended consequences. Some have described it as "poetic justice." J. Maria Glover, Mass Arbitration, 74 Stan. L. Rev. 1283, 1364 (2022) (quoting transcript of oral arguments in *Abernathy v. Doordash, Inc.*, No. 19-cv-07545 (N.D. Cal. Nov. 27, 2019)). Employees, consumers, and others have sometimes successfully filed thousands of parallel, simultaneous, small-stakes demands for arbitration, often in circumstances that would impose larger costs on the defendant than the classwide litigation they had attempted to avoid. *See* Heckman, 120 F.4th at 677; *see also, e.g., Abernathy v. DoorDash, Inc., 438 F. Supp. 3d 1062, 1068 (N.D. Cal. 2020)* ("No doubt, DoorDash never expected that so many would actually seek arbitration. Instead, in irony upon irony, DoorDash now wishes to resort to a class-wide lawsuit, the very device it denied to the workers, to avoid its duty to arbitrate."); *Adams v. Postmates, Inc., 414 F. Supp. 3d 1246, 1248 (N.D. Cal. 2019)* (granting motion to compel arbitration of thousands of individual claims), *aff'd, 823 F. App'x 535 (9th Cir. 2020)*; Uber Tech., Inc. v. Am. Arb. Assn., Inc., 204 A.D.3d 506, 167 N.Y.S.3d 66, 70 (2022) ("While Uber is trying to avoid paying the arbitration fees associated with 31,000 nearly identical cases, it made the business decision to preclude class, collective, or representative claims in its arbitration agreement with its consumers, and AAA's fees are directly attributable to that decision.").

The rise of such "mass arbitration" demands persuaded some potential defendants to abandon individual arbitration altogether. *See* Glover, *supra*, at 1292-93 & nn.34-35. Others have begun looking for ways "to gain in arbitration some of the same advantages of class-wide litigation while suffering few of its disadvantages." Heckman, 120 F.4th at 677. Some of these attempts have been more successful than others.

One of the most prominent failures was the arbitration agreement the Ninth Circuit took up in Heckman, cited above. *See* id. at 684-85. Live Nation had set up a "bellwether" arbitration procedure in which three individual cases would be selected, resolved quickly in summary arbitration procedures, and then employed as precedents for disposing of the others. **[*21]** *See* id. at 678-79, 684. The problem (one of many, actually) was that the bellwether proceedings were confidential. *See* id. at 684. The plaintiffs in the other cases would not even know about the cases that bound them. *Id.* This made the bellwether procedure so one-sided as to be unconscionable: they provided the defendants with "many of the protections and advantages of a class action, but provide[d] to the non-

bellwether plaintiffs virtually none of its protections and advantages." *Id. at 685*. They had no insurance that they were adequately represented, no notice, no chance to object, and no chance to opt out. *Id.*

*MacClelland v. Cellco Partnership* is another example of an unenforceable bellwether procedure. *See generally* 609 F. Supp. 3d 1024 (N.D. Cal. 2022). It was one of the first cases in which any federal court applied California law to a bellwether arbitration procedure. It involved an arbitration agreement for Verizon Wireless customers. *See id. at 1040*. The agreement set up a bellwether procedure that would be triggered if 25 or more customers represented by the same or "coordinated" counsel filed notices "raising similar claims." *Id.* The attorneys on each side would choose five cases to be "bellwethers." *Id.* These claims would go first. *See id.* If Verizon and **[*22]** the claimant group could not settle all of the remaining claims after the ten bellwether cases were resolved, then the process would continue "until the parties are able to resolve all of the claims, either through settlement or arbitration." *Id.* The remaining cases would not be "filed" at all until the bellwether process took its course. *Id.* The agreement left no doubt that its object was to stop large groups of claimants from inundating the company with similar demands for arbitration. It specifically permitted Verizon to ask a court to "enjoin the mass filing of arbitration demands." *Id.*

The district court found this procedure unfairly one-sided and thus unconscionable in the substantive sense. *See id. at 1040-44*. By limiting the number of simultaneous arbitrations to ten, the agreement significantly delayed resolution of many claims. *See id. at 1040*. Almost three thousand claimants had already retained counsel by the time the district court took up the motion to compel arbitration. *See id.* If each of the bellwether arbitrations lasted about as long as the average arbitration, then resolving all of the outstanding claims could take many years. *See id.* Requiring Verizon's customers to wait years before they **[*23]** could even file an arbitration demand was "unreasonably favorable" to the company. *Id. at 1042*. The delay contravened the public policy that "justice delayed is justice denied." *Id.* (quoting *Dietrich v. Boeing Co., 14 F.4th 1089, 1095 (9th Cir. 2021)*). Some claimants might even have found themselves without any possibility of any relief. Verizon had expressly reserved its right to assert a defense based on the statute of limitations. *See id. at 1042*. If the customers did not settle quickly, they might be out of luck. *See id.* Verizon had also ensured that it would be free to select the same law firm to represent it in its defense against every claim, no matter whether the bellwether procedure was triggered. *See id. at 1043*. Its customers, by contrast, would be forced to sort themselves into non-coordinated groups, each represented by different counsel, none larger than 25, if they wanted to avoid the bellwether procedure. *See id. at 1042-43*.

In the years that followed, other courts have found for similar reasons that arbitration agreements containing comparable bellwether procedures are unconscionable in the substantive sense. *See, e.g., Rios v. HRB Digital LLC, 807 F. Supp. 3d 975, 989-92 (N.D. Cal. 2025)*; *McKeown v. SAS Retail Servs., LLC, No. 25-03654, 2025 U.S. Dist. LEXIS 258039, 2025 WL 3563717, at *7-8 (N.D. Cal. Dec. 12, 2025)*; *Pandolfi v. Aviagames, Inc., No. 23-05971, 2024 U.S. Dist. LEXIS 159007, 2024 WL 4051754, at *6 (N.D. Cal. Sept. 4, 2024)*, *aff'd*, *2025 U.S. App. LEXIS 22065, 2024 WL 2463742, at *1 (9th Cir. Aug. 27, 2025)*, *cert denied*, *No. 25-1008, 224 L. Ed. 2d 832, 2026 WL 1377138 (U.S. May 18, 2026)*; *Achey v. Cellco P'ship, 475 N.J. Super. 446, 293 A.3d 551, 557-60 (N.J. Super. App. Div. 2023)*.

Some defendants have had more success in aggregating or streamlining arbitration demands. CDS cites two of these cases. ( **[*24]** *See* Doc. 27 at 16.) Both were about the terms of service imposed by the online retailer Temu. *See generally* *Kohler v. Whaleco, Inc., 757 F. Supp. 3d 1112 (S.D. Cal. 2024)*; *Silva v. Whaleco, Inc., No. 24-02890, 2024 U.S. Dist. LEXIS 187951, 2024 WL 4487421 (N.D. Cal. Oct. 10, 2024)*. Rather than setting up a bellwether system, the agreement included a "batch arbitration provision." *757 F. Supp. 3d at 1128*. Under that provision, if twenty-five or more individual arbitration notices were filed "with the assistance of the same law firm, group of law firms, or organizations," if these individual notices were "of a substantially similar nature," and if they were all filed within thirty days, then the American Arbitration Association would "administer the arbitration demands in batches of 100 Arbitration Notices per batch concurrently." *Id.* This batching procedure was unlikely to cause any significant delays, and one claimant would not be bound by the results of any other claimant's arbitration, so the district court decided the contract was not substantively unconscionable. *See id. at 1128-29*; *see also* *2024 U.S. Dist. LEXIS 187951, 2024 WL 4487421, at *5*.

A second example of an enforceable agreement is the "mass-claims protocol" that the district court reviewed in *McGrath v. Doordash, Inc., No. 19-05279, 2020 U.S. Dist. LEXIS 207491, 2020 WL 6526129, at *4 (N.D. Cal. Nov. 5, 2020)*. It provided that test cases would be chosen randomly; that they would be resolved within 120 days, followed by an optional 90-day mediation procedure; and that claimants could opt out **[*25]** of the arbitration process and "go back to court" if they preferred. *See* *2020 U.S. Dist. LEXIS 207491, [WL] at *4, 10*. This protocol was "not so biased that it negate[d] the agreement to arbitrate." *2020 U.S. Dist. LEXIS 207491, [WL] at *11*. The district judge who oversaw *McGrath* is actually the same judge who later decided *MacClelland*, cited above, and he cited these distinguishing features to explain why he declined to enforce the bellwether agreement in *MacClelland. See* *609 F. Supp. 3d at 1043* (citing *2020 U.S. Dist. LEXIS 207491, 2020 WL 6526129, at *4*); *see also* *Tercero v. Sacramento Logistics LLC, No. 24-00953, 2025 U.S. Dist. LEXIS 2995, 2025 WL 43125, at *9 (E.D. Cal. Jan. 7, 2025)* (reasoning similarly); *Ruiz v. Carmax Auto Superstores, Inc., No. 23-1986, 2024 U.S. Dist. LEXIS 52048, 2024 WL 1136332, at *6 (C.D. Cal. Jan. 18, 2024)* (same).

CDS reads these decisions as establishing something of a four-part test for enforceability. (*See* Doc. 27 at 16.) Its counsel made a similar argument on behalf of a different client in *McKeown*, but without success. *See* *2025 U.S. Dist. LEXIS 258039, 2025 WL 3563717, at *7-8*. As the district court held in *McKeown*, California law does not include a formal four-part tests like the one CDS proposes. Courts use the same analysis in arbitration disputes as they do in any other. They ask whether the circumstances of the contract's negotiation, its formation, its terms, and its practical effects show that the contract is overly harsh or generates one-sided results, as summarized above. *See id.*; *see also* *Fuentes, 19 Cal. 5th at 103*; *Armendariz, 24 Cal. 4th at 114*. To be sure, if one contract is like another that was litigated in a previous case, then the previous case could **[*26]** help to show what outcome is right. *See, e.g.,* *McKeown, 2025 U.S. Dist. LEXIS 258039, 2025 WL 3563717, at *7-8* (discussing similarities to and differences with the agreement in *MacClelland, 609 F. Supp. 3d 1024*). But the question would still come down to the contract's terms and the circumstances of its creation.

The arbitration agreement in this case establishes the following bellwether procedure:

> Bellwether Arbitration Procedures
>
> Notwithstanding any provision of the JAMS Rules, these bellwether arbitration procedures shall be used when more than 10 cases pending at the same time present substantially similar or overlapping allegations of fact or law. A court of competent jurisdiction, and not JAMS or an arbitrator, shall resolve any dispute over whether these bellwether procedures apply to any group of claims.
>
> Purpose and Rationale
>
> A large number of arbitration cases with similar allegations will impose excessive transaction costs regardless of the cases' merit or lack of merit. It also is logistically difficult or impossible to arbitrate simultaneously large numbers of substantially similar cases. The parties therefore agree to use bellwether litigation procedures similar to those that courts use in mass-tort cases, based on the judiciary's experience that, after one or a few cases **[*27]** are tried to verdict, most or all of the other cases settle or otherwise resolve themselves.
>
> Procedures
>
> To the maximum extent permitted by law, no more than 10 cases will be active at any one time. All remaining cases will be stayed, with the statute of limitations tolled. As soon as one of the original active cases is resolved (by decision, settlement, or otherwise), a stayed arbitration shall replace it on the list of 10 active cases. Except as provided below, cases shall be placed on or moved to the active list in the order demands for arbitration are first received. Until a case is on or is moved to the list of 10 active cases, the sum the Employee paid to initiate a case shall be refunded, and the Company shall have no obligation to pay any JAMS or arbitrator fees.
>
> Hardship

> If Employee claims unusual hardship from any delay pursuant to the bellwether procedure, Employee may petition the Company to waive the 10-case limit for that case. If the Company does not agree, Employee may petition JAMS to place Employee's case on the list of 10 active cases, on the ground that delay will impose exceptional hardship. If JAMS finds unusual hardship and grants Employee's petition, JAMS shall (based **[*28]** on its determination of relative hardship) remove one other case from the list of 10 active cases and place it at the head of the list of stayed cases. Under no circumstances shall JAMS place more than 10 cases into active status. If more than 10 hardship applications are granted, JAMS shall determine which 10 cases shall proceed first, based on its determination of relative hardship.

(Doc. 21-3 at 17 (emphasis and headings reproduced as in original).)

CDS is right to point out that this procedure avoids some of the pitfalls highlighted above. CDS's procedure expressly tolls the statute of limitations, it does not keep the results of the bellwether cases confidential, and it omits the "same counsel" and "coordinated cases" provisions that can sometimes lead to one-sided results. But CDS's bellwether procedure has problems of its own.

Delays are the first. By their very nature, bellwether procedures create delays for some claimants. If more than ten employees have claims, then some of them must wait for the others to finish their arbitration. They could ask CDS to waive the 10-case limit, but the agreement does not impose any obligation on the company to do this. Nor does the agreement **[*29]** offer any guidance to explain what the company may or may not consider when it makes its decision, how long it may take to decide, or whether it must offer any reasons or explanations. If the company refuses, the agreement permits aggrieved employees to petition JAMS to substitute their case for one of the pending cases on the ten-case list, but the petitioning employees must show "exceptional" or "unusual hardship," which, again, are undefined. The agreement also sets no time limits on JAMS's decision, imposes no obligation upon it to consider any particular evidence or information, and requires no explanation or reasons. Even if JAMS does grant the petition, it cannot increase the number of active cases from ten to eleven. It could only make a substitution. The delay would simply be foisted on a different employee. At least some employees will inevitably face indefinite delays. They cannot opt out of the process, either, as the plaintiffs could in the cases CDS cites, including *Kohler* and *Silva*, discussed above.

These delays are not necessarily short, either. Arbitration can take several months. *See* *MacClelland, 609 F. Sup. 3d at 1040*. Delays may in fact be longer here than average if there are any disputes about whether the **[*30]** bellwether procedures apply to a particular claim among the ten, which will be litigated in "[a] court of competent jurisdiction," not the arbitrator. (Doc. 21-3 at 17.) This one-sided procedure is inherently unfair. *See* *McKeown, 2025 U.S. Dist. LEXIS 258039, 2025 WL 3563717, at *8*. "There is simply no adequate justification for forcing someone in [Gustin's] position to wait an indefinite amount of time for other people's claims to be resolved. It is 'one of the basic principles of our legal system—justice delayed is justice denied.'" *Id.* (quoting *Dietrich, 14 F.4th at 1095*).

But even apart from these delays, the bellwether procedure is one-sided by its very nature. It "has a built-in asymmetry." *Pandolfi, 2024 U.S. Dist. LEXIS 159007, 2024 WL 4051754, at *7*. It is "predictable" that employees will have claims that trigger the bellwether procedure. *Id.* It is difficult to imagine any circumstances in which CDS might assert ten or more similar claims against an employee. The one-sidedness of this arrangement is so predictable, in fact, that the agreement defines the bellwether procedure as a process for resolving employee claims. (*See* Doc. 21-3 at 17.) The agreement also justifies the bellwether procedure by explaining that multiple claims "impose excessive transaction costs" and create logistical difficulties. (*Id.*) CDS has not explained **[*31]** why its employees might face "excessive transaction costs" when many of them file similar claims. It has not explained what logistical difficulties employees might encounter, either. Excessive arbitration costs and the logistical challenges of multiple employee claims are problems for the company, not for the employees. Employees will rarely benefit from the coordination of their claims like CDS will. *See* *Pandolfi, 2024 U.S. Dist. LEXIS 159007, 2024 WL 4051754, at *7*. The ten-case cap is, by all indications, an arbitrary ceiling: it is a limit designed specifically and primarily to minimize CDS's expenses and control its own exposure.

According to the arbitration agreement, the goal of the bellwether procedure is to create a process that resembles those "that courts use in mass-tort cases," ostensibly referring to multi-district litigation or "MDL." (*See* Doc. 21-3 at

17.) "The analogy is unpersuasive." *Rios, 807 F. Supp. 3d at 991*. "In an MDL, plaintiffs actually file their cases, obtain procedural rights, and proceed under active judicial management—with discovery, motion practice, public dockets, and trial dates." *Id.* By contrast, CDS's bellwether procedure forces employees to cede control "of the pace of the adjudication to other claimants, arbitrators, and to [CDS] itself." **[*32]** *Id.* This is also a problem of CDS's own making. CDS selected arbitration rather than class actions or another type of judicially managed mass litigation. Having chosen arbitration, CDS cannot "shed responsibility for that choice and impose, as a matter of volition rather than necessity," a process that forces delays upon its employees as a means of controlling its expenses. *Id.*

The bellwether procedure also has elements that raise doubts about whether the Federal Arbitration Act applies to it at all. The doubts stem from the quasi-representative nature of a bellwether case. By definition, some employees will go first. Their arguments, their evidence, and their results will influence the arguments, evidence, and results that other employees employ or obtain—if not formally, then practically. That is the nature of bellwether cases. If the results of the bellwether cases played no role in the later cases, they would not be bellwether cases. *See* *Heckman, 120 F.4th at 685*. As the arbitration agreement itself explains, "after one or a few cases are tried to verdict, most or all of the other cases settle or otherwise resolve themselves." (Doc. 21-4 at 17.) And so, in addition to pursuing the one-sided goal of managing the company's costs, **[*33]** the bellwether procedure forces many employees to arbitrate against the backdrop of their predecessors' litigation decisions, whether good or bad.

Elements like these prompted the Ninth Circuit to write in *Heckman* that a bellwether structure is one method of gaining "in arbitration some of the advantages of class-wide litigation while suffering few of its disadvantages." *Id. at 677*. But "Congress did not have class-wide arbitration in mind when it passed the FAA." *Id. at 689*. "The Supreme Court has consistently disparaged the use of aggregation in arbitration." *Id. at 690* (citing *Lamps Plus, Inc. v. Varela, 587 U.S. 176, 184, 139 S. Ct. 1407, 203 L. Ed. 2d 636 (2019)* and *Concepcion, 563 U.S. at 350*). The differences between bilateral arbitration and classwide or mass arbitration are "fundamental." *Viking River Cruises, Inc. v. Moriana, 596 U.S. 639, 657, 142 S. Ct. 1906, 213 L. Ed. 2d 179 (2022)*. "Arbitration is poorly suited to the higher stakes of class litigation." *Concepcion, 563 U.S. at 350*. "A switch from bilateral to aggregative arbitration 'sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment.'" *Heckman, 120 F.4th at 690* (quoting *Concepcion, 563 U.S. at 348-49*). This is not to say that aggregate, consolidated, or class-wide arbitration is impossible or always inherently unfair. *See id.*; *see also, e.g., Jones v. Starz Ent., LLC, 129 F.4th 1176, 1182 & n.2 (9th Cir. 2025)* (explaining the differences between class or representative arbitration and consolidated **[*34]** arbitration). But when people agree to aggregate claims or arbitrate by class, the Ninth Circuit has said they are not "agreeing to 'arbitration as envisioned by the FAA.'" *Heckman, 120 F.4th at 690* (quoting *Concepcion, 563 U.S. at 351*). Arbitration agreements that create "bellwether cases and batch proceedings" are "an entirely new form of dispute resolution intentionally designed to avoid individual, bilateral adjudication of claims" that the FAA protects. *Id. at 692* (Van Dyke, J., concurring in the judgment); *see also* *id. at 689* (majority op.) (agreeing with this reasoning).

Although the FAA's limits are a cause for concern, the Court will not decide whether this case falls within them. *See Rios, 807 F. Supp. 3d at 994* (similarly stopping short of addressing this potential problem). The parties have not addressed the issue, and under California law, the delays and the inherently one-sided nature of the bellwether procedure show that the agreement is at least moderately unconscionable in the substantive sense, regardless of whether the FAA applies. *See id. at 989-92*; *McKeown, 2025 U.S. Dist. LEXIS 258039, 2025 WL 3563717, at *8*; *Pandolfi, 2024 U.S. Dist. LEXIS 159007, 2024 WL 4051754, at *6*. In short, the bellwether procedure unfairly grants CDS many benefits of class litigation, while causing delays and withholding protections that employees would ordinarily have in class litigation or a similar system of mass **[*35]** litigation.

### B. Scope, Duration, and Other Provisions

Gustin argues that the agreement is unconscionable for several other reasons, but not persuasively. He first argues that the arbitration agreement is unfairly one-sided because it will forever force him to arbitrate a wide variety of miscellaneous disputes against many unrelated third parties, even claims unrelated to his employment, without foisting the same obligation upon CDS or any of these third parties. (*See* Doc. 23 at 15-17, 20.)

The agreement is not as broad as Gustin contends. True enough, it states quite expansively that it covers "all statutory, contractual and/or common law claims" and is not "limited to" claims that arise under several statutes that protect employment claims. (*See id.* at 15.) But its first sentence refers specifically to disputes "between an employer and an employee," and it cites the commonality of those specific disputes (and the cost of resolving them) as the "reason" for arbitration in the first place. (*See* Doc. 21-3 at 15.)

In addition, when the agreement lists examples of the types of claims it covers, it refers to the sorts of claims that commonly arise in employment disputes, such as claims under **[*36]** the federal Age Discrimination in Employment Act, the California Labor Code, the California Fair Employment and Housing Act, and the federal Fair Labor Standards Act. (*See id.*) The agreement also provides that the arbitration will be administered under the JAMS Employment Arbitration Rules. (*See id.* at 16.) Applying the so-called "ejusdem generis" interpretive rule would therefore suggest that the agreement was intended to cover only employment claims. *See* *Cocom v. ABM Aviation, Inc., F.4th , No. 25-3246, 2026 U.S. App. LEXIS 18092, 2026 WL 1793637, at *5 (9th Cir. June 23, 2026)*.

The agreement is nevertheless at least "somewhat ambiguous." *Ayala-Ventura v. Superior Court, 119 Cal. App. 5th 241, 255, 342 Cal. Rptr. 3d 500 (2026)*, *review denied* (June 17, 2026). It might be reasonable to read it as covering all statutory, contractual, and common law claims. It might also be reasonable to read it as covering only claims that arise out of the relationship between CDS as employer and Gustin as employee. Under California law, ambiguities in an adhesive contract like this one are usually resolved against the one who drafted it. *Id.* California courts also follow the rule that when a contract "is susceptible to two interpretations, on which renders it valid and the other which renders it void, a court should select the interpretation that makes the contract valid." *Id.* (quoting *Ramirez, 16 Cal. 5th at 507*). Both of these rules point toward a narrow interpretation in this situation. Construing the arbitration agreement against the drafter (i.e., the defendant employer) **[*37]** and in the way that renders it valid (i.e., not unconscionable), shows that it was intended to be a narrow agreement that covers only claims arising out of the employer-employee relationship between CDS and Gustin. *See id.*; *see also* *Cocom, 2026 U.S. App. LEXIS 18092, 2026 WL 1793637, at *5* (following *Ayala*).

Gustin argues the agreement in his case is like the one the California Court of Appeal declined to enforce in *Cook v. University of Southern California, 102 Cal. App. 5th 312, 321 Cal. Rptr. 3d 336 (2024)*. The agreement in *Cook* was broader than the agreement Gustin signed. It expressly covered "all claims, whether or not arising out of [the plaintiff's] employment, remuneration, or termination," including "claims for personal, physical, or emotional injury or for any tort." *Id. at 317*. There were also many ways in which disputes could potentially have arisen between the plaintiff and the defendant, i.e., whole of the University of Southern California. "As an example, the trial court observed that if [the plaintiff] were to undergo a botched surgery at USC's hospital in 15 years, her claims would still be subject to arbitration." *Ayala, 119 Cal. App. 5th at 257* (citing *Cook, 102 Cal. App. 5th at 318*). Gustin alleges, by contrast, that CDS provides marketing inside Costco stores. (Doc. 1-2 at 3.) Suffice it to say that a similarly "vast range" of claims and disputes is much less likely to arise from marketing **[*38]** in Costco stores. *Ayala, 119 Cal. App5th at 257*; *see also* *Cocom, 2026 U.S. App. LEXIS 18092, 2026 WL 1793637, at *5* (distinguishing *Cook* for similar reasons).

Because the agreement is best understood as limited to claims arising out of the employer-employee relationship, its scope is not unconscionably broad; nor is its duration "infinite," as Gustin similarly contends. (Doc. 23. at 20.) Gustin worked for CDS between 2021 and 2024. Covered claims will be limited to claims about events in that time, subject to any applicable statutes of limitation. *See* *Cocom, 2026 U.S. App. LEXIS 18092, 2026 WL 1793637, at *7*. For these reasons, the arbitration agreement is not unfairly one-sided or harsh based on its scope or duration, nor based on its coverage of any claims against CDS's affiliates, related entities, and people. *See* *Ayala, 119 Cal. App. 5th at 258*.

Gustin next contends that the agreement illegally requires arbitration of representative claims, such as claims under the California Private Attorneys' General Act (PAGA). (*See* Doc. 23 at 17-18.) The FAA compels the arbitration of "individual" PAGA claims if the parties have agreed to arbitrate them, despite any state law to the contrary. *See* *Adolph v. Uber Techs., Inc., 14 Cal. 5th 1104, 1114, 310 Cal. Rptr. 3d 668, 532 P.3d 682 (2023)* (citing *Viking River Cruises, Inc. v. Moriana, 596 U.S. 639, 142 S. Ct. 1906, 213 L. Ed. 2d 179 (2022)*). This compulsion does not reach

"non-individual" PAGA claims, however, and the California Supreme Court has held that if a plaintiff "has brought a PAGA action comprising individual and non-individual claims, an **[*39]** order compelling arbitration of the individual claims does not strip the plaintiff of standing as an aggrieved employee to litigate claims on behalf of other employees under PAGA." *Id.* It is thus unclear whether the PAGA waiver actually includes an implied exception for non-individual claims as a matter of California law. It is not necessary to decide whether it does. Even if the PAGA waiver were partially unconscionable, it would be severable. *See* *Cocom, 2026 U.S. App. LEXIS 18092, 2026 WL 1793637, at *8-9* (citing and applying *Ramirez, 16 Cal. 5th at 513-18*).

Gustin argues similarly that the agreement might prevent a prevailing plaintiff from receiving an award of attorneys' fees, contrary to California law. (*See* Doc. 23 at 21.) But as CDS points out, the agreement provides expressly that the arbitrator "shall apply the substantive law (and the law of remedies, if applicable, including the law of prevailing-party attorneys' fees) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted." (Doc. 21-3 at 16.)

Finally, Gustin argues that the agreement imposes unconscionable limits on discovery in the arbitration. (*See* Doc. 23 at 18-19.) The agreement states that the JAMS Rules will govern discovery during arbitration. (Doc. 21-3 **[*40]** at 16.) "Most courts have found that the JAMS rules for arbitration provide for adequate discovery." *Zamudio v. Aerotek, Inc., 733 F. Supp. 3d 931, 945 (E.D. Cal. 2024)* (citing *Sanchez v. Homebridge Fin. Servs. Inc., No. 17-1267, 2018 U.S. Dist. LEXIS 45786, 2018 WL 1392892, at *5-6 (E.D. Cal. Mar. 20, 2018)*, in turn collecting cases). It is possible, of course, that those rules might be inadequate or inappropriate in a specific case or dispute, but Gustin does not explain why he believes they are. He argues only that the arbitration agreement unfairly gives the arbitrator "authority to order such discovery, by way of deposition, interrogatory, document production or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issue in dispute, consistent with the expedited nature of arbitration." (*See* Docs. 23 at 18-19; 21-3 at 16.) California courts "assume that the arbitrator will operate in a reasonable manner in conformity with the law." *Dotson v. Amgen, Inc., 181 Cal. App. 4th 975, 984, 104 Cal. Rptr. 3d 341 (2010)*). They have "upheld the validity of similar provisions giving the arbitrator broad discretion to control discovery." *Id.* (citing *Roman v. Superior Court, 172 Cal. App. 4th 1462, 92 Cal. Rptr. 3d 153 (2009)*); *see also, e.g.*, *Little, 29 Cal. 4th at 1081* (enforcing arbitration agreement with discovery limit because it was not "evident from the agreement that [the plaintiff] will be unable to obtain adequate discovery").

**III. Severability**

Taking stock, Gustin has demonstrated that the arbitration agreement is unconscionable **[*41]** (1) because CDS made signing a condition of employment, made it difficult for him to ask questions, did not permit negotiations, and put pressure on him to sign it (i.e., the circumstances were "oppressive"); (2) because the agreement is long, complicated, and difficult to understand without the assistance of an attorney (i.e., its results are "surprising"); and (3) because the agreement replaces easily foreseeable class litigation in a court with a bellwether arbitration procedure that is objectively inferior for employees and objectively superior for CDS (i.e., it is not just a bad bargain).

If a contract is unconscionable, the court can either sever the unconscionable term or refuse to enforce the contract altogether. *Ramirez, 16 Cal. 5th at 513*. This is a discretionary decision. *See id.* The trial court has "broad leeway." *Heckman, 120 F.4th at 688*. CDS urges the court to sever any terms it finds unconscionable, but only briefly, and without applying the relevant legal standards. (*See* Docs. 21-1 at 19 n.4; 27 at 20-21.)

The California Supreme Court elaborated on a trial court's discretion to sever in *Ramirez*, a case about an unconscionable arbitration agreement. *See* *id. at 489*. "At the outset, a court should ask whether 'the central purpose of the **[*42]** contract is tainted with illegality.' If so, the contract cannot be cured, and the court should refuse to enforce it." *Id. at 516* (quoting *Armendariz, 24 Cal. 4th at 124*). "If that is not the case, the court should go on to ask, first, whether the contract's unconscionability can be cured purely through severance or restriction of its terms, or whether reformation by augmentation is necessary." *Id.* If no 'reformation is required,' the offending provision can be severed or limited, and 'the rest of the arbitration agreement left intact,' then severance or restriction is the preferred course for provisions that are collateral to the agreement's main purpose." *Id.* (quoting

Little, 29 Cal. 4th at 1075). "If the unconscionability cannot be cured by extirpating or limiting the offending provisions, but instead requires augmentation to cure the unconscionability, then the court should refuse to enforce the contract." *Id.* "Courts cannot 'rewrite agreements and impose terms to which neither party has agreed.'" *Id.* (quoting Sonic, 57 Cal. 4th at 1143). "[I]f the contract contains a severance clause, the court should take it into account as an expression of the parties' intent that an agreement curable by removing defective terms should otherwise be enforced." *Id. at 517*.

"Even if a contract ***can*** ***[*43]*** be cured, the court should also ask whether the unconscionability *should* be cured through severance or restriction because the interests of justice would be furthered by such actions." *Id.* (emphasis in original). When the agreement is an arbitration agreement, the court "focuses on whether mere severance of the unconscionable terms would function to condone an illegal scheme." *Id.* The court must also ask "whether the defects in the agreement indicate that the stronger party engaged in a systematic effort to impose arbitration on the weaker party not simply as an alternative to litigation, but to secure a forum that works to the stronger party's advantage." *Id. at 516-17*. "If the answer to either question is yes, the court should refuse to enforce the agreement." *Id. at 517*. "In conducting this analysis, the court may also consider the deterrent effect of each option." *Id. at 517*.

California federal district courts have usually refused to sever unconscionable bellwether arbitration procedures from the remainder of an arbitration agreement. *Pandolfi, 2025 U.S. App. LEXIS 22065, 2025 WL 2463742, at *2* (affirming district court's decision not to sever); *Heckman, 120 F.4th at 688-89* (same); *Rios, 807 F. Supp. 3d at 993-94* (declining to sever); and *MacClelland, 609 F. Supp. 3d at 1044-46* (same). They have relied on three points. First, they have seen the bellwether provisions **[*44]** as part of a larger, systematic effort by a more powerful actor to force people in an inferior bargaining position into an inferior forum, where they may neither arbitrate individually nor enjoy the protections and formalities of classwide litigation. *See, e.g., Heckman, 120 F.4th at 688*; *MacClelland, 609 F. Supp. 3d at 1046*. Second, they have pointed out that severing the bellwether provisions would give employers and other companies an incentive to retain those provisions and attempt to enforce them, with the hope that at least some potential litigants would be deterred from pursuing their rights in court. *See, e.g., Pandolfi, 2025 U.S. App. LEXIS 22065, 2025 WL 2463742, at *2*; *Rios, 807 F. Supp. 3d at 994*. Third, some have expressed concerns about creating a "patchwork agreement," which could lead to confusion, both in the same case and in future cases. *See Rios, 807 F. Supp. 3d at 994*.

The outlier appears to be the district court's order in *McKeown. 2025 U.S. Dist. LEXIS 258039, 2025 WL 3563717, at *9*. The court decided to sever the unconscionable bellwether provision and to enforce the remaining agreement. *Id.* It concluded that severing the provision would permit the plaintiff to arbitrate individually without any of the delays or unfairness that would attend to a bellwether proceeding. *See id.* The district court was unpersuaded that the bellwether provision "was intended to force [the plaintiff in that case] to **[*45]** participate in an inferior forum," but it did not elaborate. *See id.* Nor did the court consider the potential chilling effects on other potential plaintiffs, nor the broader incentives that severance might create. *See id.* It did not explain why it was unpersuaded by the reasoning in *Heckman, MacClelland*, *Rios*, and *Pandolfi*.

The majority position is more persuasive. In effect, CDS has set up a system of resolving employment disputes that puts the case in its preferred forum at every step of the way. The company seems to have preferred a federal court for the adjudication of its motion to compel arbitration; hence its notice of removal. But CDS appears to prefer an arbitrator when it comes to the substance of the employees' wage and hour claims, so it moves now to compel arbitration and to dismiss the lawsuit. But in the arbitration itself, should there be a massive influx of similar claims by the thousands of people it employed—which would hardly be an unexpected result, given the size of the potential class and Gustin's allegations—CDS would prefer a bellwether process in which it could dispatch of the claims against it cheaply, at a relaxed and convenient pace, and without any of the rules, **[*46]** precedent, or risks that would attend to a class action in a state or federal court. It is difficult to see why any part of this process might be preferable to the employees who, like Gustin, claim that they were underpaid. The costs of pursuing either litigation in court or individual arbitration outside the bellwether procedure are likely to deter at least some potential claimants with valid claim from raising those claims at all. Severing the bellwether provisions would be "an

ineffective half-measure or, potentially, a reward for bad faith." *Rios, 807 F. Supp. 3d at 994*. Severing the bellwether provisions could also lead to confusion and inconsistent outcomes. *Id.*

**CONCLUSION**

The motion to remand (Doc. 12) and the motion to compel arbitration (Doc. 21) are **DENIED**.

IT IS SO ORDERED.

Dated: July 6, 2026

/s/ Jennifer L. Thurston

UNITED STATES DISTRICT JUDGE

---

End of Document